## Maxon, Respondent, vs. Gates, Appellant.

*May 12—September 29, 1908.*

**(1)** *Contracts: Abrogation: Pleading.* (2, 3) *Appeal: Review of evidence: Motion to set aside verdict.* (4, 5, 9) *Special verdict: Sufficiency: Waiver: Changing answers.* (6) *Findings of fact: Recitals in judgment.* (10, 11) *Tax titles: Sufficiency of deed: Recitals.* (7, 8, 12–17) *Vendor and purchaser of land: Evidence: Readiness of purchaser to perform: Sales by vendor to others: Measure of damages for breach of contract: Market value: Deduction for tax titles.*

1. In an action upon a contract, abrogation thereof by mutual consent is new matter and, if relied upon as a defense, must be specially pleaded.

2. A motion for judgment notwithstanding the verdict does not challenge the sufficiency of the evidence to support the findings and cannot be treated as a motion to set aside the verdict on that ground.

3. Where there was no motion to set aside the verdict the supreme court will not review the evidence to determine its sufficiency.

4. In an action for breach of a contract it was stipulated that a special verdict be taken as to all issues except certain ones reserved for trial by the court. No objection was made to the form or sufficiency of the questions submitted, and in answer to one of them the jury found that the contract had not been, as alleged in the answer, abrogated on a certain day by mutual consent. There was no motion to set aside this answer, and no suggestion was then made that the issue as to abrogation had not been determined. Afterwards for more than two years proceedings were had at intervals for the purpose of ascertaining the amount of the damages. *Held*, that defendant's counsel had treated the question of abrogation of the contract as embraced in and determined by the special verdict or as settled by the undisputed evidence, and could not properly contend, on appeal, that the question was still open as to an abrogation subsequent to the day mentioned.

5. The court cannot change the answer to a question in the special verdict if there is any credible testimony to support it.

6. A recital in the judgment that allegations of the complaint had been established by the undisputed evidence is *held* sufficient as a finding of facts, although the practice is not approved. If defendant desired a more particular finding he should have requested it.

7. A finding that plaintiff had been at all times ready and willing to perform on his part a contract for the conveyance of lands to him, is *held* to be sustained by the evidence.

8. In an action for breach of a contract to convey lands, evidence that after the contract was made defendant had conveyed certain of said lands to other parties was admissible as bearing upon the intention of defendant to repudiate the contract and also as showing the value of the lands from the consideration stated in the deeds.

9. An order was made on defendant's motion, after the testimony had closed, reopening the case as to certain issues upon the express condition that the parties agree and stipulate that the findings of the jury then impaneled be taken by way of special verdict on all the other issues. No objection was made to the special verdict, which embraced the questions counsel then thought material for determination; there was no motion to set aside; nor was the attention of the trial court at any time called to any supposed omission therefrom, although the trial was protracted for a long time thereafter. *Held*, that questions as to the form and sufficiency of the verdict were foreclosed.

10. A tax deed reciting that "J. L. Gates, and assignee of Ashland county, has deposited" certain tax certificates, etc., sufficiently shows that J. L. Gates, the applicant for the deed, presented himself as assignee of the county. The word "and" before "assignee" should be rejected as surplusage or as written by the ' clerk through mistake for "an."

11. A further recital in the deed that it appears from the certificates that the lands described were for nonpayment of taxes sold "at public auction, at Ashland, in the county of Ashland and J. L. Gates," on a day named, "to the said Ashland county for the sum," etc., shows that the lands were sold to the county. The words "and J. L. Gates," inserted after "the county of Ashland," describing the place of sale, cannot be transposed and inserted after "Ashland county" where it is named as the purchaser, and thus make it appear from the deed that there was a joint sale to the county and Gates, which would be unlawful. *Sprague v. Cœnen*, 30 Wis. 209, distinguished.

12. The "market value" of land is the price that would in all probability result from fair negotiation where the seller is willing to sell and the buyer desires to buy; and the expressions "actual value" and "market price" mean the same thing.

13. In an action for breach of a contract to convey a large quantity of lands—some by quitclaim deeds and others by warranty deed subject to incumbrance—the measure of plaintiff's dam-

ages is the difference between the price agreed to be paid and the actual value of the lands at the time of the breach, if sold in a body, subject to outstanding incumbrances, to one ready and willing to buy; such damages to be ascertained with reasonable certainty as the natural result of the breach and as within the probable contemplation of the parties at the time the contract was entered into.

14. Evidence of sales made at or about the time of the breach of a contract to convey lands is admissible as bearing upon the actual value, when it appears that there has been no sudden change in conditions. In this case too much weight is *held* to have been given to evidence of sales made a year or more after the breach and after there had been a decided advance in values.

15. The value of the lands in small parcels should not in such a case be taken as the basis of damages, since that would be greater than their value in a body and neither party could have contemplated a resale in small parcels within a short time.

16. Upon the evidence in this case it is *held* that the fair market value of the large quantity of lands which defendant held by tax titles and was to convey to plaintiff by quitclaim deed was $1.75 per acre.

17. Although a tax deed fair upon its face is *prima facie* a marketable title, yet, it being matter of common knowledge that a tax title is not as acceptable to the ordinary purchaser as an original title, it was proper for the court, in determining the amount of damages for breach of a contract to convey by quitclaim deed lands held by tax titles, to make a deduction for diminution in value on that account; and a deduction of fifteen cents per acre is *held* reasonable in this case.

APPEAL from a judgment of the circuit court for Milwaukee county: E. B. BELDEN, Judge. *Modified and affirmed.*

This action is brought to recover damages for breach of a contract entered into between the plaintiff and defendant January 8, 1900, whereby the defendant agreed that he would within a reasonable time cause to be conveyed to the plaintiff by quitclaim deed, executed by himself and wife and the International Land Company, certain lands in Ashland and Iron counties. The descriptions of these lands were contained in Exhibits A and B, attached to the contract. Defendant also agreed that he would, at the same

time, transfer to plaintiff certain tax certificates covering said lands held by him and said company, and also to assign all claims for trespass committed upon such lands, if any, in favor of the grantor. In the same contract defendant also agreed that he would within a reasonable time cause to be conveyed to the plaintiff, by quitclaim deed executed by the Ashland County Land Company, substantially all the stock of which was held by him, certain other land, situated in Ashland county, the descriptions of which were contained in Exhibit C, attached to the contract. The lands embraced in these descriptions will be referred to hereinafter as the "tax-title lands" or the "quitclaim-deed lands." In the same contract the defendant covenanted to cause to be conveyed to plaintiff, by warranty deed from the Ashland County Land Company, certain other land situated in Ashland county, described in Exhibit D, attached to the contract, subject to an agreement for the sale of the timber thereon to Charles E. Tobey, said lands to be free and clear of all incumbrances except said timber contract. The lands embraced in this description will be hereinafter referred to as the "warranty-deed lands." The plaintiff agreed in said contract to pay as the purchase price the sum of $3,000 on performance by the defendant, $2,000 upon the day of the execution of the deeds and the delivery of the tax certificates mentioned, and the balance to be secured by a mortgage upon the lands.

The action was first tried in Ashland county, where it was originally brought, and a special verdict rendered, which was set aside on plaintiff's motion. The order granting a new trial was affirmed upon appeal taken by the defendant to this court. *Maxon v. Gates,* 112 Wis. 196, 88 N. W. 54. Thereafter the venue was changed from Ashland county to Milwaukee county.

The complaint, as amended, sets out the making of the contract, that the plaintiff has been at all times since its execution ready and willing to perform on his part, that he has

frequently demanded performance of the defendant, that the latter has refused and still refuses to perform, and that the plaintiff has thereby sustained damages to the amount of $15,500, for which judgment is demanded.   The contract is attached to the complaint as an exhibit.

The answer, as amended, puts in issue the material allegations of the complaint.   It alleges that on January 8, 1900, the plaintiff represented to the defendant that he was desirous of purchasing the tax deeds and certificates which the county of Ashland held, described in the exhibits attached to said contract and situated in said county; that the rule of said county was to sell only to the owners of the land, and that he desired the defendant's signature to said contract to enable him to make the purchase as such owner; that if he did not succeed in acquiring the certificates and tax deeds of the county board, referred to, within six days, he would return the contract to the defendant; that the defendant, relying upon said statements, did sign the contract and intrust the same to the plaintiff upon the conditions stated; that the contract was never delivered and never had any binding force for any other purpose.   It is then alleged that the plaintiff did not succeed in purchasing said tax titles within six days from January 8th, or at any time, and that he never paid the defendant the sum of $3,000, or any part thereof, for said lands; that said plaintiff, on the 16th day of January, 1900, came to the office of the defendant in Milwaukee and then informed him that he could not get Ashland county to sell its subsequent tax certificates and tax deeds to him, as he supposed; that said plaintiff then and there stated that he could not and did not want to purchase said land and certificates from said defendant and declined to carry out the terms and conditions of said contract, and it was then and there mutually agreed between said parties that said contract was abrogated and annulled, "and that the deal was off without damages to either party."   The an-

swer then contains a general denial of the averments of the complaint not expressly admitted.

Upon the issues raised by these pleadings the action came on for trial in the circuit court for Milwaukee county before a jury, the Hon. E. B. BELDEN, judge presiding. The trial continued until the 1st day of February, 1904, at which time the testimony was closed. Thereupon questions for a proposed special verdict were submitted by both plaintiff and defendant. Before the verdict was submitted to the jury the defendant moved the court for leave to reopen the case in order to enable him to show the state of the title, so far as taxes, tax certificates, and tax titles or deeds were concerned, of the lands described in Exhibits A, B, and C, attached to the contract, between May 1, 1893, and June 1, 1900. After argument a recess was taken, presumably to enable counsel to submit the form of the order to be entered upon defendant's motion. When the trial was resumed a form of order was submitted and the order was finally agreed upon and entered, the substantive part of which is as follows:

"Ordered, that the case be and is hereby reopened, and defendant is hereby permitted to offer evidence as to the state of said titles as above set forth, and the plaintiff is permitted to offer evidence in rebuttal of defendant's evidence hereby permitted to be introduced, and the parties hereto are also permitted to further show the value of said lands described in said Exhibits A, B, and C, and the title thereto, as they may be advised. This order having been made upon the express condition and terms that the parties to said action mutually agree and stipulate that the findings of the jury now impaneled in said cause may be taken by way of a special verdict at once as to all the issues in said cause other than the issues as to the titles to the lands above referred to, and said jury then discharged, and that the court may, at some future date to be fixed by the court, take evidence as to said titles and values and determine the issues in reference thereto, and in making its findings upon said issues the court may consider all the evidence in the case and take the finding of the jury

as to the value of said lands in said Exhibits A, B, and C as advisory merely, and that when said findings are made the court may enter its judgment as though all the issues in the case had been submitted to and determined by the jury."

Thereupon a special verdict was rendered by the jury, in which it found: (1) That on January 8, 1900, the plaintiff did not state to the defendant that he could not carry out the trade with *Gates* unless Ashland county consented to transfer to plaintiff its tax certificates and tax deeds on the lands described in Exhibits A, B, and C, attached to the complaint; (2) that the agreement of January 8, 1900, was not signed by the defendant and given to plaintiff conditionally, to go into effect only upon the plaintiff acquiring the tax certificates and tax deeds of Ashland county upon the lands described in Exhibits A, B, and C, attached to the complaint; (3) that on the 16th day of January, 1900, the deeds of the International Land Company and *James L. Gates* and wife and the Ashland County Land Company were not executed and ready for delivery; (4) that the defendant did not on the 16th day of January, 1900, offer such deeds and tax certificates and titles held by him and the International Land Company and the Ashland County Land Company to the plaintiff properly executed; (5) that the plaintiff and defendant on the 16th day of January, 1900, at the office of *James L. Gates,* in the city of Milwaukee, Wisconsin, did not mutually agree that the writing dated January 8, 1900, should not be enforced; (6) that in January and February, 1900, the market value of the lands described in Exhibit D, attached to the contract of January 8, 1900, including the water power thereon and exclusive of the timber thereon, was $4,000; (7) that in January and February, 1900, the market value per acre of the lands described in Exhibits A, B, and C, attached to the contract of January 8, 1900, was forty cents per acre.

Upon the return of the special verdict the defendant

moved for judgment in his favor notwithstanding the verdict. The defendant made no motion for a new trial. On October 30, 1905, after a number of continuances, the trial of the case was resumed upon the issues reserved to be tried by the court under the order of February 1, 1904, and was continued until the 7th day of February, 1906, at which time the testimony was closed.

A stipulation was entered into between the parties December 8, 1906, wherein it is admitted that the title to said land described in Exhibit 1, thereto annexed, was on January 8, 1900, good in *James L. Gates* or the International Land Company, and that the title to said land described in Exhibit 2, thereto annexed, was at said date good in said *James L. Gates* or the Ashland County Land Company, and the amount required to redeem each of said descriptions of land on March 1, 1900, from outstanding tax sales or certificates and taxes other than those held by *Gates* was that set out in said exhibits opposite each such description. It was further agreed that *Gates* held certain tax certificates against certain lands included in the contract, and one of which was stated in Exhibit 3, attached to the stipulation. In regard to certain other lands, the descriptions of which are set out in Exhibit 4, attached to the stipulation, it was agreed that if a certain tax deed, which had been offered in evidence and marked "Exhibit W1," is valid, then the defendant had title to such lands, and they were to be conveyed to plaintiff under the contract. The amount of tax certificates held by defendant against certain of these lands was stated, and the amount required on March 1, 1900, to redeem each description of land in this exhibit was agreed upon. Exhibits 5 and 6, attached to the stipulation, contained descriptions of land originally held by defendant, or by one or the other of the two companies mentioned, which had been conveyed away prior to January 8, 1900, and to which the plaintiff abandoned any claim. It was further

agreed that neither the defendant nor either of said companies had on January 8, 1900, any title to any of the lands in controversy in this action (except the lands described in Exhibit D, attached to the contract), except the titles mentioned in the stipulation, and all of said titles were tax titles. This stipulation removed from consideration a number of descriptions amounting to 17,200 acres, included in the contract, and among the lands which were to be conveyed by quitclaim deed. The plaintiff made no claim on account of any of these lands and no damages were allowed by the court in respect of them.

The court found the value of the lands, the title to which was admitted by the stipulation, to have been $23,459.43 at the time the contract was broken; deducted from this amount the total taxes outstanding against them, amounting to $9,974.49, leaving a net value of $13,484.94; made a further deduction of fifteen cents an acre in view of the fact that all the titles were tax titles; and added $116.60 as the value of the tax certificates held by the defendant which were to have been transferred to plaintiff—making a total of $12,362.99 as damages on account of these descriptions at the time of the breach of the contract. The court found that the tax deed, Exhibit W1, was valid, and fixed the value of the lands embraced in it at $3,160; deducted from this $925.28, as the amount of outstanding taxes, leaving a net value of $2,234.72; and made a further deduction of fifteen cents an acre as before—leaving a net balance of $2,063.72 as plaintiff's damages on account of these descriptions. The jury had found the value of the lands described in Exhibit D, attached to the contract, which were to be conveyed by warranty deed, to be $4,000. This was added to the damages found by the court. From the total of all these sums was subtracted the sum of $3,000, which was to have been paid by plaintiff under the contract. This left a balance of $15,426.71 as the amount of plaintiff's recovery for

the breach of his contract. Interest was added from April 2, 1900, the date of the commencement of the suit, to July 11, 1907, the date of entry of the judgment, making an amount of $22,157.85, and to this was added $631.76 as the costs of the action, making a total of $22,789.61, the amount of the judgment, from which this appeal was taken.

Defendant filed specific exceptions to the findings of the court relating to the breach of the contract by the defendant, to each valuation placed by the court upon the several descriptions of land, to the total net valuations of all the lands, to the amount of the deductions to be made for tax titles, and separate exceptions to the conclusions of law.

For the appellant there were briefs by *Winkler, Flanders, Bottum & Fawsett,* attorneys, and *James G. Flanders,* of counsel, and oral argument by *Mr. Flanders.*

*Glenway Maxon, in pro. per.,* and *Frank M. Hoyt,* of counsel, for the respondent.

The following opinion was filed June 17, 1908:

BASHFORD, J. Counsel for appellant concede that the issue raised by the answer, that the contract of January 8, 1900, was executed conditionally, is settled by the special verdict in view of the conflicting testimony. We have, then, as a starting point, an absolute contract binding upon both parties. It is urged, however, on behalf of appellant that this contract was abrogated by mutual consent of the parties. Abrogation, like a release or discharge, is new matter constituting a defense, and, if relied upon, must be specially pleaded. Sec. 2655, Stats. (1898); 18 Ency. Pl. & Pr. 89; *Salchert v. Reinig,* 135 Wis. 194, 115 N. W. 132. The answer alleges that on January 16, 1900, the parties mutually agreed that the contract was abrogated and annulled. The jury, in answer to the fifth question of the special verdict, found that the parties did not on January 16, 1900, mutually agree that the contract of January 8, 1900, should

not be enforced. Appellant's counsel now contend that the question whether the contract was subsequently abrogated by mutual consent is not foreclosed by this finding, and that defendant's motion for judgment notwithstanding the special verdict leaves this question still open. The questions for a special verdict, as prepared by the court, were apparently approved by counsel for appellant. Certainly no modification thereof was suggested and no objection thereto taken, and the question of abrogation, as raised by the pleadings, must therefore be treated as having been fairly submitted. After the verdict was received this question and answer were not challenged by defendant's counsel, who made a motion for judgment notwithstanding the verdict. The motion for judgment notwithstanding the verdict admits for the purpose of the motion the existence of the facts found by the jury, and asserts that, taking the verdict at its face, the judgment should go the other way. *Muench v. Heinemann,* 119 Wis. 441, 96 N. W. 800; *Hay v. Baraboo,* 127 Wis. 1, 105 N. W. 654. It does not challenge the sufficiency of the evidence to support the findings, and cannot, therefore, be treated as a motion to set aside the verdict upon that ground. There was no motion to set aside the verdict, and consequently this court cannot review the evidence upon the subject. We conclude, therefore, that this issue of abrogation was settled by the special verdict.

This conclusion is re-enforced by the provisions of the order to reopen the case for the trial by the court of the questions relating to the title and value of the quitclaimdeed lands. It was therein stipulated that the findings of the jury should be taken by way of a special verdict as to all the issues except those mentioned. The form of the verdict was then under consideration, as appears from recitals to the order. It was not challenged either as to the form or the sufficiency of the questions to be submitted, and it is clear that counsel then understood that it covered all the contro-

verted facts except such as were reserved for trial by the court. There was no motion to set aside the answer to this question after the verdict was rendered, and no suggestion then made by counsel that this issue had not been determined. Thereafter, for a period of more than two years, at different intervals, the court was engaged in hearing proof upon the questions reserved, the arguments of counsel, and preparing the findings and judgment. There was no occasion for this continued, protracted, and expensive trial if the contract was not in force, as all the subsequent proceedings were had for the purpose of ascertaining the amount of damages for its breach. We must hold that appellant's counsel, by their conduct as above indicated, have treated this question of the abrogation of the contract as embraced in and determined by the special verdict or as established by the undisputed evidence. *Geisinger v. Beyl,* 80 Wis. 443, 50 N. W. 501.

Counsel for appellant insist that the finding of the court that he breached the contract is contrary to the great preponderance of the testimony. This issue, so far as it is raised by the pleadings, is decided by the special verdict. The answer denies the execution of the contract by the defendant except conditionally, and avers that it was abrogated by mutual consent on January 16, 1900. Defendant testified that upon that day he offered to perform the contract on his part and that he then tendered the deeds therein called for to the plaintiff. The jury, by the answers to the third and fourth questions, negatives these statements of the defendant. There was no objection to the form of these questions and no request to submit a question embodying an offer of performance at a later date. In answer to the fourth question the jury found that the defendant did offer to the plaintiff the tax certificates and titles held by him, "but not properly executed." Appellant's counsel moved to strike out the words quoted as unsupported by the evidence. The court cannot

change the answer to a special verdict if there is any credible testimony to support it. The answer as given is sustained by a clear preponderance of the evidence, and the court in its findings of fact adopted March 1, 1900, as the date of the breach. Counsel for appellant, in argument, do not claim that the deeds tendered to the plaintiff by the defendant were executed in accordance with the contract, but rather seek to excuse the failure to offer full performance. The proof sustained the finding of the court, to which exception was taken, as to the fact of the breach by the defendant and as to the date thereof. The plaintiff, in a letter addressed to the defendant, dated February 23, 1900, stated that he then was and for some time had been ready to perform the contract on his part, and requested performance by the latter. The defendant's reply, bearing the same date, expressed surprise "that you should claim or demand anything from me or for the deeds," and contained a refusal of performance on his part. Plaintiff again wrote, insisting upon performance, and defendant's reply, dated February 27th, in substance repeated his refusal to perform and a denial of liability for damages. These letters and his conduct prior thereto, evidenced by correspondence and conveyances, showed beyond question that the defendant had decided that he would not comply with the terms of this contract. Appellant was not prejudiced by the finding of the court that the breach occurred on or about March 1st, and fixing upon that as the date for ascertaining the damages.

The complaint alleges that the plaintiff was and at all times had been ready and willing on his part to perform the contract. Counsel for appellant contend that this averment was put in issue by the general denial contained in the answer, and that the question has not been determined either by the special verdict or by the finding of the court. There was no request to submit this issue to the jury, but it was treated as settled by the testimony; and it would seem to be

too late to raise the question in view of the subsequent proceedings heretofore referred to.    In the findings of the court there is the following recital:

"And the truth of all the allegations of the plaintiff's complaint, other than those determined by said stipulation, said special verdict, and by the findings of the court hereinafter set out, having been established on the trial by the undisputed evidence," etc.

There was no exception to this recital by the appellant. Where the recitals of the judgment amount to findings of fact they have been held sufficient, although the practice is not approved.    If the defendant desired a more particular finding on this issue he should have called the attention of the court thereto and should then have taken an exception to the refusal to find, or to the finding as made, if not satisfactory.    *Wrigglesworth v. Wrigglesworth,* 45 Wis. 255. However, if this objection had been properly and seasonably taken, we could not have reached a different conclusion from the evidence than that stated by the trial court.    *Mr. Maxon* testified that he was ready to perform on February 23d, when the pretended tender of the deeds and certificates was made by the defendant.    And the plaintiff in the letter already quoted advised the defendant he was and had been ready to perform on his part.    These statements are not disputed, and the recital of the court was fully warranted by the testimony.    It was held upon the former appeal that it was not necessary for the plaintiff to tender payment of the purchase price to enable him to maintain an action for a breach of this contract by the defendant.    *Maxon v. Gates,* 112 Wis. 196, 88 N. W. 54.

Counsel for appellant contend that the trial court erred in treating the defendant's ability to perform the contract on his part as one of the issues in the cause.    Reference is made to the complaint, in which it is stated that the defendant was able to perform, and it is claimed that there is noth-

ing in the answer which can be construed as putting this allegation in issue. The answer does not expressly admit this averment of the complaint and contains no direct reference thereto, and it concludes with a general denial of every allegation therein not expressly admitted. We are unable to understand why, if the general denial is to be treated as putting in issue the plaintiff's ability to perform, it does not raise the question of defendant's ability. In view of the finding that the plaintiff was ready and willing to perform on his part and that the defendant refused, this objection can have no materiality except as it relates to the admission of proof as to certain conveyances made by the defendant of the lands in question to other parties after the contract was entered into. This testimony was admissible as bearing upon the intention of the defendant to repudiate the contract and also as showing the value of the land from the consideration stated in the deeds. If the testimony was material we are unable to see how the defendant has been prejudiced by its admission.

But we must hold that the questions raised on behalf of the appellant with reference to the proceedings upon the trial by the jury, by the consent order entered, are foreclosed by the special verdict and the order entered in connection therewith, reopening the case for the trial of the issues not embodied therein by the court. This order was made upon the express condition that the findings of the jury then impaneled should be taken by way of a special verdict as to all the issues in said cause other than the issues relating to the title and value of the quitclaim-deed lands, that the findings of the jury upon these last issues should be taken as advisory merely, and that when findings were made judgment should be entered as though all the issues had been submitted to and determined by the jury. The special verdict, which embraced the questions counsel then thought material for determination, found that the contract had not been executed con-

ditionally by the parties, that it had not been abrogated, that it had been breached by the defendant, and the value of the lands to be conveyed by warranty deed, and also, as advisory, the value of the quitclaim-deed lands. If there was a material issue that was not embraced in the verdict as prepared, the attention of the court should then have been called thereto, or, if it was subsequently discovered that such an issue had been unintentionally overlooked, that fact should have been brought to the attention of the court, so that the order might have been modified, and the issue so omitted included therein for the determination of the court. It would seem like a travesty upon justice to proceed with this protracted and expensive trial and then to set aside the judgment upon any ground not going to its merits.

Counsel for the respective parties, by stipulation entered into December 8, 1906, agreed upon the validity or invalidity as to the titles of the lands which were to be quitclaimed by the defendant to the plaintiff under the terms of the contract, except the tax deed marked "Exhibit W1," which was offered in evidence by the plaintiff and objected to by the defendant upon the ground that it was void upon its face. The trial court sustained the validity of this deed, and this ruling is assigned as error on behalf of the appellant. The tax deed recites:

"Whereas, *James L. Gates,* ^ *and assignee of Ashland county,* has deposited in the office of the county clerk of the county of Ashland, in the state of Wisconsin, seventy-five (75) certificates of the county treasurer of said county whereby it appears" that the lands described were for the nonpayment of taxes separately sold by the county treasurer of Ashland county "at public auction, at Ashland, in the county of Ashland, ^ *and J. L. Gates* on the nineteenth day of May, in the year of our Lord one thousand eight hundred and ninety-one, to the said Ashland county, for the sum of three hundred fifty-two dollars and sixty-four cents," etc.

On behalf of the appellant it is claimed that this deed is void for the reason that there is nothing in it to show that *James L. Gates,* the grantee therein named, was either the purchaser or the assignee of the purchaser at the tax sale, and also for the reason that the deed shows that the sale was a joint sale made by the treasurer of Ashland county to the county and *James L. Gates.* Counsel for respondent claim that it appears from this deed that the lands were sold at a tax sale to Ashland county, and that it appears upon its face that *James L. Gates* is the assignee of Ashland county. Both counsel rely upon *Washburn L. Co. v. C., St. P., M. & O. R. Co.* 124 Wis. 305, 102 N. W. 546. That case holds that substantial compliance with the form prescribed by statute is all that is required; that omissions and blunders that do not prejudice or deceive any one or affect the substance of the conveyance do not militate against the rule of substantial accuracy required by the statute. Reference is made to the three significant features material to the deed, the first of which is that the recitals therein should show that the applicant presents himself as the original owner of the certificate or as his assignee. It is apparent from the first line of this deed that *James L. Gates* presented himself as assignee of Ashland county. The singular verb is used, showing that the application was made by one person only. Consequently the language used cannot be construed to mean that there was an assignee of Ashland county in addition to *James L. Gates,* who presented the certificates. The word "and" before "assignee" should be rejected as surplusage, or as written by the clerk through mistake for "an." The second requirement, as stated in the opinion cited, is that the recital should show the name of the purchaser at the tax sale, in order that it might appear that he was a person competent to purchase. It appears from the recitals in this deed that the lands were sold to Ashland county. The words *"James L. Gates"* are inserted after "the county of

Ashland," describing the place of sale, and it is not permis-
sible to transpose those words and insert them after "Ash-
land county" where it is named as the purchaser. These
blunders in the reciting part of the deed, evidently made by
the county clerk, cannot mislead anybody and do not invali-
date the instrument. Counsel for appellant also refers to
*Sprague v. Cœnen,* 30 Wis. 209. In that case it appeared
from the deed itself that the land was sold "to the county of
Brown and Edson Sherwood." The court held that this
could have been no other than a joint sale, which was en-
tirely unauthorized by law, and the deed was therefore void.
That decision can have no application to the deed before us
upon the construction we have placed upon its recitals. In
the granting part it conveys the land described to *James L.
Gates,* and we hold that he thereby acquired the title, and
that these lands were embraced in the contract of sale to the
plaintiff.

The remaining assignments of error relate to the measure
of damages and present questions of serious difficulty in the
application of legal principles to the circumstances of this
case. The jury found the value of the 2,100 acres which
were to be conveyed by warranty deed to be $4,000. There
was a water power situated upon these lands and some indi-
cations of mineral, and the testimony was sufficient to sus-
tain this finding. With respect to the 30,000 acres of land
which were to be conveyed by quitclaim deeds, and the titles
to all of which were doubtful, the jury found the value to be
forty cents an acre, but made no deduction for the expense
of clearing up these titles. There was no proof before the
jury to show the condition of these titles, and this valuation
covered the whole tract in its existing state of uncertainty.
It was stipulated that the verdict as to these lands should be
treated as advisory merely, and that the court should, upon
proof to be submitted, determine the questions of title and
value for the purpose of fixing definitely the amount of dam-

ages, if any, that were to be recovered. The parties them-
selves, after investigation, subsequently stipulated that there
were 8,257.02 acres the title to which was undisputed. The
court placed a value on this land of $23,459.43, or an av-
erage price of $2.84 an acre. The validity of the tax deed
"W1" was disputed by defendant, but it has been upheld by
the court, and it embraces 1,140 acres. The trial court
found the value of these lands to be $3,160, or an average of
$2.77 an acre. The value of the tax-title lands, as ascer-
tained by the court, aggregates $26,619.43. The court made
deductions from this valuation of $10,886.39, the principal
item being for unpaid taxes, making the net value thereof
$15,733.04. In addition thereto is the valuation of the war-
ranty-deed lands, fixed by the jury in the sum of $4,000,
making the total net value of the lands $19,733.04 in Jan-
uary and February, 1900 (the date will hereafter be referred
to as March 1st), which the defendant had agreed to sell the
plaintiff for $3,000 on January 8, 1900. Such a result is
startling, and, if the parties were differently circumstanced,
might challenge the contract as unconscionable. But the
defendant had been purchasing tax titles upon cut-over
lands, had been dealing in real estate in northern Wisconsin
for over thirty years, and must be presumed to have had
some knowledge of the location and value of these tracts,
while the plaintiff's experience in such matters was more
limited. The parties dealt at arms' length, each competent
of understanding his own interests and of protecting his
own rights. In entering into this contract they must be held
to have comprehended the nature and possible consequences
of its breach. It hardly seems credible that the defendant,
with his large experience in such matters, would have volun-
tarily sold to the plaintiff these lands for less than one-sixth
of their actual value. The proof does not show any cause
for an extraordinary increase in the value of lands situated
as these were between the date of the contract and its breach.

The conclusion of the trial court as to the amount of damages recoverable by the plaintiff has called for a careful consideration of the application of the legal principles upon which the findings are based and of the evidence upon which they are sought to be supported.

The general rule for the measure of damages in an action brought by the vendee against the vendor for breach of such contract is the value of the land the defendant contracted to sell, estimated at the time the contract was broken, less what the plaintiff agreed to pay therefor. *Muenchow v. Roberts,* 77 Wis. 520, 46 N. W. 802.

"In estimating damages the court and jury are to look at the nature and terms of the undertaking or thing to be done; how it was expected and intended or proposed to enjoy that which the parties have bargained for, and how they were and would be benefited by performance or damnified by a breach of the particular engagement under the particular circumstances." 8 Am. & Eng. Ency. of Law (2d ed.) 584.

"And so it is often said that, in an action for a breach of contract, the damages to be recovered are such as may reasonably be supposed to have been in the contemplation of both parties when they made it." *Brown v. C., M. & St. P. R. Co.* 54 Wis. 342, 353, 11 N. W. 356, 360.

"The damages recoverable for breach of contract are such as may fairly and reasonably be considered the natural and proximate result thereof, and in the light of circumstances, special or otherwise, known to both parties at the time of making the contract, may reasonably be supposed to have been in contemplation by them as the probable result of such breach." *Gross v. Heckert,* 120 Wis. 314, 321, 97 N. W. 952, 954.

"So it is held that prospective profits should not be allowed, without evidence to base the same on sufficiently certain to remove the result from the realms of pure conjecture." 120 Wis. 329, 97 N. W. 957.

The market value of land at any time is the price that would in all probability result from fair negotiation, where the seller is willing to sell and the buyer desires to buy.

*Sharpe v. U. S.* 112 Fed. 893, 898; *Ligare v. C., M. & N. R. Co.* 166 Ill. 249, 46 N. E. 803; *Lawrence v. Boston,* 119 Mass. 126. The expressions "actual value," "market value," or "market price," when applied to an article, mean the same thing. *Sanford v. Peck,* 63 Conn. 486, 27 Atl. 1057. These general rules are not questioned. They are supposed to be founded upon principles of natural justice, and should be so applied as to secure reasonable compensation to the injured party.

Where the subject of sale is a staple commodity, the difference between the contract price and the market price at the time of the breach is readily ascertainable and generally furnishes a safe standard for the measure of damages. *T. B. Scott L. Co. v. Hafner-Lothman Mfg. Co.* 91 Wis. 667, 65 N. W. 513. This rule is not altogether appropriate to the present situation, the more adequate criterion of damages here being compensation for the actual loss suffered under the principles above stated. The evidence of sales made at or about the time of the breach is admissible as bearing upon the actual value, when it appears that there has been no sudden change in conditions, and the proof in that regard offered on behalf of the respective parties has received such consideration as the circumstances seem to warrant.

The plaintiff here, therefore, is entitled to recover, as compensation for the defendant's refusal to convey, the difference between the price agreed to be paid and the actual value of the lands on March 1, 1900, if sold in a body, subject to outstanding incumbrances, to one ready and willing to buy, such damages to be ascertained with reasonable certainty as the natural result of the breach and as within the probable contemplation of the parties at the time the contract was entered into. In the application of the law to the evidence in this case, the court erred in adopting as a basis for compensation the value of the lands in small parcels, and in giving too great weight to the proof of sales made a

year or more subsequent to the breach and after there had
been a decided advance in values.  There is a great discrep-
ancy in values of this class of lands, dependent upon the
amount of timber, the nature of the soil, the remoteness of
the situation from railways and settlements, and the absence
of highways and schoolhouses.  The court in the findings
places a high value upon separate tracts of forty acres or
less, 980 acres being valued at $2 or less, and the remainder
at $2.50, $3, $3.50, $4, and $5 per acre, making the aver-
age about $2.80 per acre.  The plaintiff himself testified:
"Prices of a small quantity of land, or land at retail, would
be more than prices of land in large quantities."  Neither
party could have contemplated a sale of these lands in small
parcels within sixty days, or that the measure of damages in
case of breach would be estimated by the aggregate values of
separate descriptions after all outstanding liens had been
discharged and the titles established.  That the method of
valuation was prejudicial to the defendant is demonstrated
by the verdicts of the two juries.  The first trial of the ac-
tion took place at Ashland in 1901, and the jury fixed the
value of the 30,000 acres of quitclaim-deed lands, incum-
bered with outstanding tax claims and with the titles uncer-
tain, at ten cents an acre.  Upon the second trial in 1901 the
jury placed a valuation upon the same lands, in the same
situation, at forty cents an acre.  The last verdict was
treated as advisory merely, and was not entitled to great
weight, after the parties had stipulated as to the quantity of
land with good title and the amount of the outstanding liens.
Had this verdict been permitted to stand, the total valuation
would have been subject to a large deduction to redeem from
tax sales and cover the labor and expense involved in mak-
ing the necessary investigation to ascertain the condition of
the titles and the amount of the incumbrances.  A better
test is afforded by the finding of the last jury that the 2,100
acres of warranty-deed lands, with the water power and min-

eral rights, was worth $4,000 on March 1, 1900.    With re-
spect to this tract the plaintiff had testified that it was worth,
exclusive of the water power and timber, $3 per acre, and
that the water power was worth $10,000, making a total of
$16,300.    The timber had been sold subject to removal be-
fore the contract was entered into, and the defendant, in
his testimony, placed a valuation upon this land of $400, in-
cluding the water power, which he did not consider of any
value.    The jury, from these conflicting statements and the
other testimony offered, reached the conclusion that this
land was worth about $1.90 per acre, and this finding is not
challenged by either party, by motion to set aside the answer
or otherwise.    It is practically conceded, at least the proof
sufficiently establishes the fact, that these lands were more
valuable than the remainder embraced in the contract.    It
is true that after the verdict was rendered further proof was
offered as to the value of the quitclaim-deed lands, but after
a careful examination thereof we conclude that it does not
warrant the high valuation fixed by the court.

For a proper application of the rules of law, as above
stated, for ascertaining the compensation to be awarded for
the breach of this contract, in addition to the verdict already
mentioned, the evidence may be considered with reference to
the condition of the market in the spring of 1900 for the
sale of land similarly circumstanced, in a body, the opinions
of witnesses, based upon actual conditions, and the sales
which were made at or about that time.    These were known
as "cut-over lands," from which the pine and spruce had
been removed, and which had been abandoned by the original
owners and sold for the nonpayment of taxes.    They were
mainly situated remote from any railroad or settlement and
were mostly without highways or schoolhouses.    The hard-
wood, where there was any, was not readily salable by reason
of the situation, and the lands possessed no immediate value
for agricultural purposes, even where the soil was suitable.

Witnesses called by the defendant, who were familiar with the situation, testified that there was no market for such lands in large bodies in the spring of 1900, that there were hundreds of thousands of acres for sale in Ashland, Bayfield, Iron, Price, and adjoining counties, with few purchasers, and that there was no demand for such lands except for trading or speculative purposes. The highest price placed upon such lands in a body at that time by these witnesses was fifty cents an acre. The defendant, who had been dealing in such lands in northern Wisconsin for thirty-five years, testified with respect to the quitclaim-deed lands that prior to the signing of this contract he had made efforts to sell them to all the speculators and prospective buyers in the country, and that they had been looked over by fifty prospective purchasers; that he had offered them at wholesale in 1899 and 1900 at twenty-five cents an acre. The statements of *Mr. Gates* as to his efforts to sell these lands were not disputed. The experts called on behalf of the plaintiff placed a much higher value on these lands, basing their estimates on the situation and condition of particular descriptions and not upon the sale of the entire tract in a body. The valuation fixed by them was upon the average much higher than that found by the court. We can but feel that these witnesses were very largely influenced in giving their opinions by the sales that were made of land in small parcels and after there had been a decided advance in price, and consequently their estimates cannot have weighty consideration. It appears from a preponderance of the evidence that there was a rise in the price of such lands beginning in the latter part of 1900, and that the price increased in a marked degree during the ensuing four or five years. The actual sales made immediately before January and February, 1900, and shortly thereafter may be considered with other proof, though it cannot be given controlling weight, in determining the values to be placed upon these lands. The price agreed to be paid

ought also to have some bearing on this question. This sale for $3,000 embraced 2,100 acres of land to be conveyed by warranty deed, with a water power and mineral indications, which the jury has valued at $4,000, and about 10,000 acres to be conveyed by quitclaim deed.

It is apparent that the parties themselves considered the tax-title lands as of little value. During the negotiations for the purchase of these lands the plaintiff selected and purchased lands in the same vicinity of the defendant, on November 18, 1899, 520 acres for $250, subject to outstanding tax certificates, which, when bought, made the total cost $1.43 per acre. About the same time the plaintiff purchased another tract of 1,000 acres, similarly situated, incumbered with tax certificates, for seven and one-half cents an acre, which, when the title was cleared up, cost $1.40 an acre. The defendant testified that in January, 1900, he sold 11,000 acres of cut-over lands in Price county, upon which the taxes were paid, for sixty-two and one-half cents an acre; that they were similar in character to the lands here in question, but more favorably located. This testimony was corroborated by the purchaser of the tract. Defendant testified to another sale of 10,000 acres in the same county, similarly circumstanced, at forty cents an acre; that he purchased 40,000 acres from the Weyerhauser estate in Sawyer county in 1900, with a clear title, for ninety cents an acre; that these lands were better than the Ashland county lands and were sold in 1901 for $1.50 an acre; that in September, 1899, he bought 82,000 acres of cut-over lands from Price county at twenty-five cents an acre; that in 1900 he purchased 100,000 acres of such lands from Chippewa county, of better quality and location, for fifty cents an acre; that he bought 50,000 acres of cut-over lands in Bayfield county, in January, 1900, for thirty cents an acre; that at about the same time he purchased 21,000 acres from Washburn county, with the taxes all paid, at ten cents an acre. Mr.

Kennan, an intelligent witness for defendant, who had had large experience in dealing in such lands in northern Wisconsin, testified to sales made by him, or with his knowledge, from March, 1899, to January, 1901, the prices varying with the situation and character of the lands, the quantity of timber, and the condition of the title. He mentions a sale of 520 acres, heavily timbered, on August 20, 1901, by a warranty deed for $1,250; a sale January 11, 1901, of 3,100 acres in Ashland county, subject to tax titles, for $150; a sale of 17,000 acres of cut-over lands in Iron county, December 13, 1900, for fifty cents an acre; a sale of 4,000 acres August 10, 1901, fairly well timbered, for $1.61 an acre; a sale on October 12, 1901, of 8,000 acres, for $1.50 per acre, some of it well timbered, by warranty deed, taxes all paid, and better located than the lands in suit; a sale of 5,000 acres in Ashland county, October 20, 1901, at $1.87 an acre, the greater part of the land heavily timbered and taxes all paid; that the purchaser failed to complete the purchase, and the same lands were sold a year later for $2.50 an acre. The only sale of a large tract of land testified to by any witness for plaintiff was 11,978 acres in Ashland county, sold September 1, 1901, for $4.50 per acre. These were better lands than those here in question and carried valuable timber, and were bought by the owners of a mill for lumbering and manufacturing purposes. The purchasers required an abstract of title and warranty deeds and bought the land primarily for the timber, as they were not engaged in the real-estate business. Mr. Nash, one of the purchasers, testified that these lands were bought primarily to supply the mill which they expected to erect there, and that had it not been for the timber they would not have cared for the lands. The sale of 12,000 acres by the Northern Wisconsin Land Company to the Underwood Veneer Company in 1899 for $3 per acre was of a similar character, the chief value being the timber for veneering purposes. The price paid for

land under such circumstances can have but little weight in determining the value of "cut-over lands" bought for an immediate resale and for speculative purposes. The proof with respect to the sales actually made, in connection with the expert testimony, still leaves considerable latitude for the exercise of judgment in determining the value of the tax-title lands.

In connection with the expert testimony and the proof of actual sales, the evidence of the parties themselves must have great weight in determining the measure of damages which they probably had in contemplation in case of a breach of this contract. Reference has been made to sales and purchases by the defendant in Ashland and neighboring counties in 1899 and 1900. On cross-examination the defendant stated that in his opinion the value of the tax-title lands on March 1, 1900, was $3,500, provided the purchaser was willing to put in more money to clear up the titles. Taking that as the net value and adding the amount of outstanding incumbrances, $10,899.77, the value of these lands upon this estimate is approximately $1.50 per acre. Reference has also been made to the testimony of the plaintiff of purchases made by him in November, 1899, of two tracts of "cut-over lands," similarly situated but in better condition, which cost him, when the titles were cleared up, on the average of about $1.42 an acre. In a letter written by the plaintiff to the defendant November 8, 1899, when negotiating for the purchase of the lands embraced in this contract, he gives his view of their value. He had then been furnished a list and had caused an examination to be made of the land situated in Ashland county, and had also sought to ascertain at what price that county would sell the tax titles and certificates which it held. He learned that the county "might be willing to sell its deeds and certificates for face. This would make your lands cost me about all they are worth." He then quotes from a letter received from a party

who had contemplated joining in the purchase with him, as
follows:

"I was at Ashland and thoroughly investigated the list of
lands you gave me, and as yet am not satisfied to go into
the deal, as I find that most of the lands have been cut over,
and even the hardwood and spruce taken therefrom. I went
over to Morse and went out with a woodsman myself and
looked over a part of the lands, and I must say that I do not
think very much of them."

The plaintiff adds:

"I recently purchased 1,000 acres of original title, which
is in far better condition than yours, for seven and one-half
cents an acre. Out of the list of lands which you gave me
not over 10,000 to 12,000 acres can be cleared up, as the
statute of limitations has run on adverse tax titles as against
you and your company, and the cream of your land is gone.
In some instances you have quitclaimed, and in other in-
stances the timber is taken off. I can see no money in it for
me, unless I can get what title you and your companies have
at a very nominal sum."

He then offered $2,000 for what title the defendant and
his companies had in the lands, the tax certificates to be
turned over with the quitclaim deeds. The better land
which plaintiff had bought for seven and one-half cents an
acre, cost him, when the title was cleared up, $1.40 per acre,
and it is apparent that he did not consider the land which he
was proposing to buy of the defendant was of any greater
value.

This view of the plaintiff's estimate of the quitclaim-deed
lands at the time the contract was entered into is reinforced
by his testimony as to the value of the 2,100 acres which
were to be conveyed by warranty deed. He estimated the
value of these lands on February 23, 1900, exclusive of the
water power, at $3 per acre, and the value of the water
power at $10,000. It is apparent, therefore, that he did not
consider the tax-title lands of great value at the time the

contract was entered into or when it was broken.   Considering the testimony of the plaintiff that the value of the tax-title lands at the time the purchase was made was less than the tract he purchased at a cost of $1.40 an acre, and of the defendant that at the time the contract was breached they were worth $1.50 per acre, and the verdict of the jury that the better lands, with the water power, to be conveyed by warranty deeds, were worth about $1.90 an acre, and the opinions of the experts and the proof of actual sales, we have concluded that the fair market value of the tax-title lands to be sold in a body in January or February, 1900, was $1.75 per acre.

The court also found that the plaintiff was entitled to a credit in the sum of $116 for tax certificates held by the defendant and which were to be transferred to the former by the latter under the terms of this contract.   The court further found that the titles of the defendant and his companies to the quitclaim-deed lands, by reason of their being tax titles, were worth fifteen cents an acre less than the value as fixed in the findings, and made the proper deduction therefor.   This finding was excepted to by the defendant and is assigned as error on this appeal.   A tax deed fair upon its face is, under our statute, a marketable title, and after the three-year statute of limitations has run in its favor there is no reason to question its validity.   *Gates v. Parmly,* 93 Wis. 294, 312, 66 N. W. 253, 67 N. W. 739.   Nevertheless, it is a matter of common knowledge that a tax title is not as acceptable to the ordinary purchaser as an original title, and consequently it was proper for the court, in determining the amount of plaintiff's damages, to consider the diminution of the value of the lands on that account.   Without undertaking to establish any fixed rule or to prescribe any particular standard, we have concluded, in view of the approval of these titles by the attorneys of the respective parties, after thorough examination, with the exception already referred

to, and which has been overruled, to accept the conclusion of the trial court upon the subject that a deduction of fifteen cents an acre is reasonable under the circumstances of this case. Making this deduction, the net value of the tax-title lands is $1.60 per acre. The plaintiff is also chargeable with $3,000, the purchase price of the land, no part of which has been paid, and also with the amount required to pay and redeem from the taxes outstanding against these lands, as found by the trial court, in the sum of $10,899.77. There were 9,397.02 acres of tax-title lands, the value of which, at the net value of $1.60 per acre, amounts to $15,035.23, leaving the value thereof, after deducting the amount required to pay outstanding taxes, $4,135.46. Upon the foregoing basis the amount the plaintiff is entitled to recover from the defendant by reason of the breach of the contract is as follows:

| | |
|---|---:|
| Verdict as to value of warranty-deed lands | $4,000 00 |
| Net value of tax-title lands after deduction | 4,135 46 |
| Tax certificates held by defendant and to be assigned | 116 60 |
| Total | $8,252 06 |
| Less purchase price | 3,000 00 |
| Amount of plaintiff's recovery | $5,252 06 |

As so modified, the judgment stands as entered July 11, 1907, as follows: Damages, $5,252.06; interest from April 2, 1900, to July 11, 1907, $2,292.53; costs as taxed, $631.76—total, $8,176.35.

*By the Court.*—Judgment modified, and affirmed as modified; respondent to pay the costs on this appeal.

On September 29, 1908, a motion by appellant for a rehearing was denied and a motion by respondent for a rehearing was dismissed.