STATE ET AL., RESPONDENTS, *v.* HOBLITT ET AL., APPELLANTS.

(No. 6,669.)

(Submitted May 5, 1930. Decided May 19, 1930.)

[288 Pac. 181.].

404

*Mr. Harry H. Parsons,* for Appellants.

*Mr. L. A. Foot,* Attorney General, *Mr. S. R. Foot,* Assistant Attorney General, and *Mr. John W. Bonner,* for Respondents.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

In November, 1928, the state highway commission established a state highway from Florence to Hamilton, in Ravalli county, and, in August, 1929, commenced proceedings to condemn a right of way across a tract of land owned by A. T. Hoblitt and wife and mortgaged to the Federal Land Bank of Spokane. The Hoblitt ranch consists of 147 acres lying east of the Northern Pacific Railway right of way and a ten-acre tract lying west thereof and used as a cow pasture. The land taken

consists of two and one-half acres of the ten-acre tract lying adjacent to the railway right of way.

In the condemnation proceeding, the prescribed procedure was followed, and a commission awarded defendants $1,000 damages, from which award they appealed to the district court, where a jury awarded them but $800, and, on the verdict, judgment was entered. Defendants moved for a new trial, which motion was denied, and they have appealed from the judgment.

Contending that the verdict is not warranted by the evidence, defendants specify error on the entry of judgment and the denial of a new trial. Error is also specified on the giving of instruction No. 15, hereinafter set forth.

The plaintiffs' testimony is directed solely to damages resulting to the isolated ten-acre tract, and is to the effect that the land taken has a value of from $50 to $75 per acre and the remainder of the tract was damaged to some extent. One A. L. Johnson placed the value of the land at $50 per acre, and stated "as to the balance of the land [the ten-acre tract] there is damage, there is no question about that * * * the way the road runs I would value the damages at one hundred dollars per acre." Counsel for defendants insists that by this testimony the plaintiffs fixed the damage to the tract at $1,000, but it is clear that the witness merely doubled the value of the land taken to cover the damage to the remainder; it would be absurd to say that the damage to an isolated tract of land used only for a cow pasture is double the market value of the tract.

As to this tract, Hoblitt and his witnesses fixed the market price at $200 per acre for the land taken and the damage to the remainder at from $100 to $125. In doing so, the witnesses testified as to the returns per acre if converted into a Bing cherry orchard, if cut up into town lots, and if planted to strawberries, celery, onions or potatoes. It was then shown that Hoblitt has an ample water right for its irrigation. The defendants, however, did not confine their testimony to the

damage done to the ten-acre tract, but asserted that the entire ranch was damaged to the extent of twenty per cent of its market value and fixed the total damage at from $3,000 to $5,000, for the following reasons:

The Hoblitt ranch is now crossed by a highway which parallels the railway some 350 feet distant; between the two stands the dwelling-house facing the road, with lawn and shade trees thirty-five years old in the front and an orchard and out-buildings in the rear. The house is a substantial nine-room structure, to which have recently been added two porches. The barns and corrals stand across the road from the house. Hoblitt is engaged in farming, dairying and raising of cattle, horses and hogs for market, for which enterprises the present arrangement is very convenient, as travelers on the highway often see his stock in the corrals and stop to make purchases, and his milk is taken up and the cans returned practically at the milking place. If the road is changed from its present position to the location of the new road across the tracks, Hoblitt's market for stock will be damaged, the scenic effect of the residence inclosure injuriously affected, depreciating the market value of the ranch; milk cans will have to be carried a distance of 350 feet, and he will be compelled to open an additional gate and have assistance in getting his cows into and out of the pasture on account of the danger in crossing the highway, on which it is said cars pass in summer at the rate of one a minute. Hoblitt and some of his witnesses are of the opinion that, to make the residence livable and the ranch salable, in the event of the change, the house would have to be reversed, necessitating the destruction of the shade trees and orchard and an entire re-adjustment within the inclosure.

This is the gist of the evidence on which the jury awarded defendants $400 compensation for the land actually taken, and $400 consequential damages, and it must be assumed that, if the damages caused by the establishment of the new road across defendants' land are alone recoverable, the jury considered and made an award for all such damages proved.

1. The paramount question for determination is as to what items of damage, shown by the evidence, should have been considered by the jury.

The Constitution of this state (sec. 14, Art. III) declares: "Private property shall not be taken or damaged for public use without just compensation having been first made to or paid into court for the owner." "The constitutional provision cannot be carried out, in its letter and spirit, by anything short of just compensation for all the direct damages to the owner of the lot, confined to that lot, occasioned by the taking of his land. The paramount law intends that such owner, so far as that lot is in question, shall be put in as good condition, pecuniarily, by a just compensation, as he would have been in if that lot of land had remained entire, as his own property." (2 Lewis on Eminent Domain, 3d ed., 1176.)

Ordinarily damages may be awarded only for injury done to the particular lot or tract of land from which the right of way strip is taken, and the above rule is applied in ascertaining the award to be made by a determination of the value of the acreage taken, and the depreciation in value of the remainder of the particular tract, regardless of what other lands the owner may possess (sec. 9944, Rev. Codes 1921; *Lewis & Clark County* v. *Nett*, 81 Mont. 261, 263 Pac. 418), but, even where two tracts are separated by a highway or watercourse, or, as here, by a railway, if they are used jointly by the owner in a single enterprise and the whole plant is depreciated in value by the proposed improvement, the direct damages suffered may be compensated (20 C. J. 736).

Here the ten-acre tract is isolated from the ranch proper and forms but an inconsiderable portion thereof, but, as it is used for the pasturing of dairy cows, milked upon the ranch, the additional inconvenience and danger in the use of the pasture after the highway is constructed would furnish an item of damages to be considered. (*Gaddis* v. *Cherokee County*, 195 N. C. 107, 141 S. E. 358; *Texas Electric Service Co.* v. *Perkins*, (Tex. Com. App. 1930) 23 S. W. (2d) 320.)

An item of damages which would enter into the depreciation of the value of the ten-acre tract—on which there is no testimony—is the cost of constructing a fence along the highway to maintain the inclosure. (*Lewis & Clark County* v. *Nett,* above.)

As to the inconvenience to which Hoblitt will be put in carrying milk cans to the new road, loss of a market place for stock, and the damages, generally, claimed as resulting from a *change* in the highway, they will accrue by reason of the discontinuance of the present road rather than the construction of the new, as to which there is nothing in the record on which we can say, except inferentially, that the new highway has any connection with the old road. Counsel for plaintiffs did, however, ask one of the defendants' witnesses if the elimination of a dangerous curve and two railroad crossings was not an improvement, and, assuming that such was the purpose of the highway commission in throwing the highway to the west of the railroad, we may further assume that at some future time the present road will be discontinued as a county road.

The highway commission is empowered, "in conjunction with the board of county commissioners of the several counties of the state," to designate what public roads shall be state highways; the establishment and construction of such highways, under federal aid projects, is under the control of the state highway commission, and it is authorized to make changes in state highways (secs. 1788–1796, Rev. Codes 1921), but nowhere in the Act granting powers to the commission (Chap. 139, Part III, Pol. Code 1921, secs. 1783–1802) is the commission empowered to discontinue or abandon a county road superseded by a state highway. The power to lay out and establish, construct or maintain highways does not confer power to vacate them. (*Texarkana* v. *Leach,* 66 Ark. 40, 74 Am. St. Rep. 68, 48 S. W. 807; *Coker* v. *Atlanta, K. & N. Ry. Co.,* 123 Ga. 483, 51 S. E. 481.) The power to discontinue a public highway is vested in the board of county commissioners of the county on

petition of freeholders of the road district. (Sec. 1635, Rev. Codes 1921.) The establishment and construction of the new highway is therefore entirely separate and distinct from the matter of the discontinuance of the present road, and the two acts are under divergent authority. The present action has only to do with the establishment of the state highway.

In cases involving the closing of city or town streets, with reference to which lots have been sold, there seems to be a divergence of opinion as to whether the lot owner has a perpetual easement which cannot be destroyed, or whether the question is one of damages for the cutting off of reasonable ingress and egress. (1 Lewis on Eminent Domain, sec. 202.) Generally, in such cases, damages are recoverable for injury suffered.

In Massachusetts, the statute corresponding to our section 9944, above, specifically provides for the estimating of damages caused by the "laying out, altering or discontinuing any highway"; yet there the court held, in a street case, that the damage suffered by a lot owner by the discontinuance of the street was not actionable, stating: "The inconvenience of the petitioner is experienced by him in common with all the rest * * * of the community. He may feel it more, in consequence of the proximity of his lots and buildings; still it is a damage of like kind, and not in its nature peculiar or specific." (*Smith* v. *Boston,* 7 Cush. (Mass.) 254.)

But whatever may be the rule as to the vacation of a city street, it does not necessarily control as to a country highway. "The distinction is that ordinary highways, or what are termed 'county roads,' are created by law for the public, and the land or its use taken from the owner in the first place by paying him its value. * * * The streets of a town or city are acquired by grant with the implied right of ingress and egress to the abutting lot owner, the grantor or the party making the dedication saying to the owners of lots, 'This right of ingress and egress you shall have'; but not so with an ordinary public road. The state creates the easement for the entire

public; its use is that of the public, one citizen having as much right to this use as the other; and when its abandonment or nonuser is deemed necessary for the public good, the county court may discontinue it altogether." (*Bradbury* v. *Walton,* 94 Ky. 163, 21 S. W. 869.)

In *Paul* v. *Carver,* 24 Pa. 207, 64 Am. Dec. 649, the supreme court of Pennsylvania said: "A public road belongs to nobody but the state; and when the government sees proper to vacate it, the consequential loss, if there be any, must be borne by those who suffer it, just as they would bear what might result from a refusal to make it in the first place." And even after the Constitution of the state was changed to provide for compensation for property "taken, injured or destroyed," that court held that on vacation of a highway there is "no taking of property" and no constitutional right to damage for injury. (*Howell* v. *Morrisville,* 212 Pa. 349, 61 Atl. 932.)

The owner of land abutting on a highway established by the public has no property or other vested right in the continuance of it as a highway at public expense, and, at least in the absence of deprivation of ingress and egress, cannot claim damages for its mere discontinuance, although such discontinuance diverts traffic from his door and diminishes his trade and thus depreciates the value of his land. (*Wilson* v. *Greenville County,* 110 S. C. 321, 96 S. E. 301, 302; *East Chicago Co.* v. *East Chicago,* 171 Ind. 654, 87 N. E. 17; *Hall* v. *Atlanta, B. & A. Ry. Co.,* 158 Ala. 271, 48 South. 365; *Hyde* v. *Minnesota, D. & P. Ry. Co.,* 29 S. D. 220, 40 L. R. A. (n. s.) 48, 136 N. W. 92; *Kachele* v. *Bridgeport Co.,* 109 Conn. 151, 145 Atl. 756; *Robinett* v. *Price,* (Utah, 1929) 280 Pac. 736.)

The fact situation in the case of *Wilson* v. *Greenville County,* above, is identical with that before us, except that the new highway was established and the old one discontinued by the same authority—the county board. After stating the above rule, the court said: "Respondent's attorneys concede that

such is the law, and that, if the old road had been merely discontinued as a public highway, without relocating it on respondent's land, he would not be entitled to damages; but they contend that the abandonment of the old and the location of the new road on the same tract of land are so closely connected that they are inseparable. The contention is unsound. The two acts are separate and distinct in fact and in law, and the legal consequences are the same as if the old and the new road had been on the land of different owners." Speaking of the old road, the court said: "If damage results merely from its abandonment as a public highway, without its being closed, it is *damnum absque injuria.*"

Here the right of way for the old road, across defendants' land, on abandonment reverts to the defendants; the road itself is not closed, and, if they desire to leave it in its present condition and connect it with the new road, they are at liberty to do so.

But whether defendants can recover damages on the discontinuance of the present road or not, from all of the authorities it is clear that they cannot recover compensation in this action for the alleged damage to be suffered by that act.

2. Having told the jury, by instruction No. 14, that, "in a proceeding to condemn land for right-of-way, the owner is entitled to the market value of the land taken for the most valuable purpose for which it is suitable and can be used, whether used for that purpose at the time or not," the trial court proceeded, over the objection of the defendants, as follows: "15. You are instructed that mere speculative uses of the land involved in this action cannot be considered; there must be some probability that the land * * * would be used within a reasonable time for the particular uses to which it is or may be adapted; the adaptability of the land for particular uses is immaterial unless the market value is affected thereby. In other words, it must appear from the evidence that the land * * * is marketable for the particular purpose for which it is alleged or shown by the evidence to be adapted or that there is reasonable expectation of some such

demand in the immediate future for the use of the land for such purpose." The objections urged to this latter instruction are that it is contradictory of the former and contrary to the decisions of this court on the subject, on which the former is based; that "reasonable time" does not enter into the determination of value with reference to the most valuable use of the land.

Section 9945, Revised Codes of 1921, provides that "for the ██ purpose of assessing compensation and damages [in a condemnation proceeding], the right thereto shall be deemed to have accrued at the date of the summons, and its actual value at that date shall be the measure of compensation of all property to be actually taken, and the basis of damages to property not actually taken, but injuriously affected."

The "actual value" is the market value, "the price that would in all probability result from fair negotiation, where the seller is willing to sell and the buyer desires to buy." (*Northern Pac. & Mont. Ry. Co. v. Forbis*, 15 Mont. 452, 48 Am. St. Rep. 692, 39 Pac. 571; *Maxon v. Gates*, 136 Wis. 270, 116 N. W. 758, 765.)

The owner has the right to obtain the market value of the land, based upon its availability for the most valuable purpose for which it can be used, whether so used or not (*Montana Ry. Co. v. Warren*, 6 Mont. 275, 12 Pac. 641), but to be *available* for a purpose means capable of being used for that purpose (Webster's New Int. Dictionary), and, as the market value at the date of the summons controls, the land must be shown to have been marketable at that time for the purpose stated (*In re Niagara Power Co.*, 133 Misc. Rep. 177, 231 N. Y. Supp. 72) ; the showing must be that the use is one to which the land may reasonably be applied (*Bloxton v. Highway Commission*, 225 Ky. 324, 8 S. W. (2d) 392), such as would probably affect a purchaser (*Emmons v. Utilities Co.*, 83 N. H. 181, 58 A. L. R. 788, 141 Atl. 65).

Lewis, in his work on Eminent Domain (3d ed., vol. 2, p. 1232), says: "It is said in some cases that it is proper to con-

sider every element of value which would be taken into consideration in a sale between private parties. But this needs some qualifications, since remote and speculative reasons are often urged by the seller in support of the valuation claimed. Some cases say the owner is entitled to the value of the property for the highest and best use to which it is adapted. This is true so far as such adaptation affects the market value. But the proper inquiry is not what is the value of the property for any particular use, but what is it worth on the market, in view of its adaptation for that or any other use.''

Speculative uses, remote and conjectural possibilities, are not to be taken into consideration, as the land must, at the date of the summons, have been ''available'' for the more valuable use shown. (*Kansas City, O., L. & T. R. Co.* v. *Weidenmann*, 77 Kan. 300, 94 Pac. 146, 147; *Salt Lake & U. R. Co.* v. *Schramm*, 56 Utah, 53, 189 Pac. 90, 91; *Yolo Water & Power Co.* v. *Hudson*, 182 Cal. 48, 186 Pac. 772.) In this category would fall the testimony as to the value of the land in question if platted into town lots, without a suggestion that there is, or ever will be, a town within ten miles of the ranch, and what it would produce in Bing cherries if cherry trees had been set out and reached full growth. Speaking of this character of testimony, the supreme court of California has said that, if such testimony is proper, witnesses would be permitted to testify that '' 'if oil were discovered upon this land it would be worth $20,000 an acre,' 'if a gold mine were discovered upon it it would be worth $10,000 an acre,' 'if a man wanted to buy it and establish a townsite it would be worth $3,000 an acre,' and so on, until such inquiry in a condemnation suit would bear a close affinity to Lord Dundreary's famous question, 'If you had a brother would he like cheese?' '' (*City of Oakland* v. *Pacific Coast Mill Co.*, 171 Cal. 392, 153 Pac. 705, 708.)

The rule announced in the *Warren* and *Forbis Cases*, above, must be applied in the light of the statutory provision that compensation must be determined on the basis of the market value of the land at the date of the summons, and, while the

owner is entitled to show the most valuable use for which the land is available, this is merely for the purpose of fixing the actual highest market value at the time specified, and discussion of uses to which the land is not then put is but sales talk, persuasive only in so far as it would convince a prospective purchaser that the price asked is reasonable under all of the circumstances shown; the jury stands in the position of the purchaser. For this reason it is said the test is, ''What is the market value of the land condemned for any commercial value [use?] of its own in the immediate present, or in reasonable anticipation in the near future?'' (*Ringwood* v. *North Jersey District*, (N. J. Err. & App. 1928) 143 Atl. 369, 371); and in *Kansas City, O., L. & T. Ry. Co.* v. *Weidenmann*, above, the court declares that ''in forming their opinions [as to the market value] they [the witnesses] may take into consideration the most advantageous use to which the property may be applied, having reference to existing and prospective conditions in the community.''

While the district court was not justified in using the expression ''in the immediate future'' in connection with the phrase ''that there is reasonable expectation of some such demand,'' that expression is elastic and ''is often used, like similar absolute expressions, with less strictness than the literal meaning may require; it has been construed to mean as soon as reasonably practicable under the circumstances'' (31 C. J. 245); and here its use could not have misled the jury, as the award made would cover the highest market value fixed by any witness on competent evidence of value, eliminating the testimony concerning town lots and the Bing cherry orchard; indeed, the award falls but little short of the highest value per acre placed on the land by any witness. The instruction does not contradict, but merely explains, that which preceded it, and, taken in connection with other instructions given, gave to the jury a fairly clear idea as the basis of compensation, and, while it is not a model of clarity nor entirely accurate

in all of its statements, it could not have affected the substantial rights of the defendants.

The giving of the instruction does not constitute reversible error and the verdict and judgment are supported by substantial evidence.

The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN and FORD concur.

MR. JUSTICE ANGSTMAN, being absent, takes no part in the foregoing decision.