UNITED STATES v. 243.22 ACRES OF LAND SITUATE IN VILLAGE OF FARMINGDALE, TOWN OF BABYLON, SUFFOLK COUNTY, et al.

No. 465.

District Court, E. D. New York.

Dec. 7, 1942.

See, also, 45 F.Supp. 361.

Harry T. Dolan, Sp. Asst. to Atty. Gen., of U. S. A. (John A. Jordan, Sp. Atty., Department of Justice, of Brooklyn, N. Y., of counsel), for petitioner-plaintiff.

E. John Ernst, Jr., of New York City, for defendant Justine L. Lambert.

Samuel Rudykoff, of New York City, for defendant Joseph W. Kay, 3d.

Benjamin Glickfeld, of Brooklyn, N. Y., for unknown defendants.

BYERS, District Judge.

Pursuant to declaration of taking of December 19, 1940, the petitioner acquired three parcels of unimproved real estate, in the township of Babylon, Suffolk County, Long Island, in the State of New York, and it is the duty of the Court to find and state the fair and reasonable value thereof at that date.

Whether the Court could legally do this, or whether the finding should be made by Commissioners of Appraisal, is a point which has been reserved by the claimants, who offered their proof without prejudice to their right to urge upon appeal that the second method alone is legally appropriate.

For reasons stated in United States v. Certain Lands, etc., D.C., 43 F.Supp. 578, it has been deemed proper for the Court to establish the values in this case.

178

I have visited and examined these properties since the testimony was taken, for such assistance as might thereby be derived, in reaching the conclusions herein stated.

The following diagram, although not quite to scale, fairly shows the damage parcels, their respective dimensions and acreage, and their location with respect to the plant of Republic Aviation Corporation.

These properties are approximately 1¼ miles east of the Village of Farmingdale and about 1 mile from the Farmingdale station of the Long Island Railroad, Central Division.

Findings

1. When the declaration was filed on December 19, 1940, damage parcels A and C were solely owned by the claimant Justine L. Lambert; and damage parcel B was jointly owned by the said Justine L. Lambert and Joseph W. Kay as tenants in common in equal shares.

2. Parcel A comprised 16.76 acres.

3. Parcel B comprised 197.41 acres.

4. Parcel C comprised 28.71 acres.

5. All of said parcels were vacant and unimproved land, covered with small sparce growth of pine trees, brush, undergrowth, and some scrub oak. The soil was sandy and incapable of cultivation unless cleared, fertilized and seeded.

6. Damage parcel A was zoned for industrial use at the time of taking.

7. Damage parcels B and C then were, and for years had been, zoned for residential use.

8. So much of parcel A as could be expectably included in industrial development fronting on Conklin Street cannot be accurately so allocated, in the absence of proof of any such recognized requirement as at the date of taking, but for present purposes it is thought that 10 acres fronting on Conklin Street and on Broad Hollow Road should be valued as a coherent unit, adapted for industrial use consistent with the then character of other properties lying on the northerly side of Conklin Street.

The remaining 6.76 acres should be valued according to the theory adopted with reference to parcels B and C.

9. Parcels B and C should be valued upon one basis, since they really constitute but a single tract, although separately identified upon the damage map because of the difference in title.

While parcel C has no highway frontage, and ordinarily would suffer in value for that reason, its availability for special use as part of a testing field for airplanes is not impaired through lack of access to either Broad Hollow Road or New Highway.

Conclusions

I. The fair value of parcel A when it was appropriated on December 19, 1940, was $13,042.00.

II. The fair value of parcel B at that date was $88,834.50.

III. The fair value of parcel C at that date was $12,919.50.

Theory of Above Valuations

As to parcel A, the 10 acre unit is thought to fairly respond to the probable requirements of industrial use as the evidence shows it to have existed in late 1940. Sales discussed in the evidence throw light upon what may be described as the probable demand, either for that acreage as a whole, or as an aggregate of smaller parcels for which a demand was almost inevitable in light of matters about to be discussed. In reaching the basic rate of $1,000 per acre, consideration has been given to all testimony and the bases of the opinion evidence so far as they have been disclosed. The sale by the Republic to Fairchild of the 4.96 acre piece at Conklin Street and New Highway is not deemed to reflect a fair meeting of the minds of a willing purchaser and a willing seller.

As to the balance of parcel A, and all of parcels B and C, it is the present opinion that, considered as unproductive acreage, the basic value of $300 per acre is fair, as the expert for the government testified; if there is any tendency toward error in that figure it is in the direction of altitude.

Had the plants devoted to the manufacture of planes not been located in the immediate vicinity from 1937 onward, these parcels would have continued in their somnolent status of unproductive waste lands, not suitable for any development except a hesitant and reluctant one for casual residential properties. They (parcels B and C) were comparatively remote from all facilities that would make them desirable for human habitation, save upon a very modest—almost crude—scale. Such use as has been made of similar property to the south of these parcels had not been promising in the sense that real estate values were thereby visibly enhanced; moreover, the onset of such a development promised to be halting and intermittent.

If these parcels had only this value on December 19, 1940, no such figure as the Court has adopted would be admissible.

That this is not the case, in my opinion, proceeds from these considerations:

The only major industry during recent years in the immediate vicinity of these parcels was that of building and equipping airplanes, and it began to assume real significance in or about the year 1937.

That the very life of our institutions would come to depend in a large measure upon the nature, extent and accelerated

development of that industry was not then broadly comprehended. But by 1938 the more thoughtful element among us awoke to an uneasy sense of apprehension lest the impact of evil European developments might be devastating upon the American · people and their· institutions in the then near future. During the ensuing two years there was an ever increasing realization, despite pathetic efforts to strangle it, that the national welfare demanded a vast expansion of all our martial resources, including largely our facilities for producing the means to conduct war in the air.

It will not be forgotten that Congress passed the Selective Service law on September 16, 1940, three months prior to the effective date under consideration, which is striking evidence of a quickened public realization that our security as a nation might well be in jeopardy. So much in this situation has to be reckoned with.

The conclusion forces itself upon this Court, that since the element of values here involved cannot be measured by active movements of comparable acreage which might be thought to establish a range of market prices (as in the case of city or of suburban properties which change hands with some frequency) recourse must be had to a reasonable appraisal of the probable mental processes of those concerned as owners or possible purchasers of these parcels, which in turn would necessarily affect demand and supply, the determining factors of market values. .

It is a question of potential rather than proclaimed values which is here presented. If of the former there was none, manifest error is present in the conclusions above set forth.

It is clear, however, to this Court at least, that the realization of the obvious necessity for the expansion and development of the productive capacity and facilities of the airplane plants in the immediate vicinity of these parcels, which was apparent in late 1940, imparted to this acreage an element of fair value which otherwise would have been absent.

▆▆ Common sense teaches and the evidence establishes, that testing fields are ·a necessary adjunct to airplane factories, and it therefore seems proper to attempt to value this acreage as though a representative of such a plant had sought to acquire these properties for that use, and the own-

ers had been willing to sell to him, knowing the purpose of acquisition. Justification for that approach lies in the following quotation from the opinion in Olson v. United States, 292 U.S. 246, at pages 256, 257, and 258, 54 S.Ct. 704, at page 709, 78 L.Ed. 1236:

"The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. [City of] New York v. Sage, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143. * * * And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account. Boom Co. v. Patterson [98 U.S. 403, 25 L.Ed. 206] ubi supra. But the value to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently to or because of the taking. Considerations that may not reasonably be held to affect market value are excluded. Value to the taker of a piece of land combined with other parcels. for public use is not the measure of or a guide to the compensation to which the owner is entitled. * * *

"Flowage easements upon these lands were not currently bought or sold to such an extent as to establish prevailing prices, at or as of the time of the expropriation. As that measure (United States v. New River Collieries, 262 U.S. 341, 344, 43 S.Ct. 565, 67 L.Ed. 1014) is lacking, ,the market value must be estimated. In respect of each item of property that value may be deemed to be the sum which, considering all the circumstances, could have been obtained for it; that is, the amount that in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy. In making that estimate there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 124, 44 S.Ct. 471, 68 L.Ed. 934. The determination is to be made in the light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require

proof. Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth." (Citing cases)

The opinion contains the following quotation from Mr. Justice Field (Boom Co. v. Patterson, 98 U.S. 403 at page 407, 25 L.Ed. 206): "In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted * * *."

If there is reason in the view here taken, that this acreage should be valued with reference to the special use to which clearly it was adapted, there remains to expound only the percentage which should be added to the otherwise acceptable figure of $300 per acre for fallow, waste sandy holdings.

I have added 50%, having in mind that the evidence indicates that the reasonable value of clearing, fertilizing, seeding, etc., is about $300 in order that the property might be put to this special use. The factor has not been arbitrarily set, although I find it difficult to explain why it is 50% rather than 45% or 55%. It will be seen that the final cost on this basis is about $750 per acre, which is 150% above the basic figure of $300 which would be acceptable except for the special use element.

The result is that $450 per acre is concluded to represent the fair value of the 6.76 acres of parcel A, not valued at $1,000 per acre as previously stated, the 197.41 acres of parcel B, and the 28.71 acres of parcel C, to be recapitulated thus:

```
Parcel A  10     acres @ $1,000.00   10,000.00
  "    "   6.76    "   @    450.00    3,042.00
                  Total Parcel A............   13,042.00
Parcel B 197.41 acres @    450.00.........   88,834.50
Parcel C  28.71   "   @    450.00..........  12,919.50
                  Total .....................  $114,796.00
```

It may be appropriate to add these comments:

The assertion in the brief of counsel for one of the owners of parcel B, that the Court's power is presently limited to determining whether the value of the land is greater than the amount deposited with the Declaration of Taking, is flatly rejected. It is the Court's duty, as presently understood, to fix the fair value of the property in light of all available evidence, and the sum deposited indicates neither the maximum nor the minimum figure which may result from the inquiry.

The ruling excluding the appraisal offered in the Transfer Tax proceedings in 1939 is adhered to, in spite of the case cited in the government's brief, because the objection was sound on several theories. It was too remote in the first place, under the circumstances here involved. It could not be binding on the cotenant who was not a party to it in any case. Since it was offered in a collateral proceeding, the outcome thereof, namely, the value fixed for inheritance tax purposes as at the death of the decedent, would be of no greater value than the assessment by the town or village authorities for that year, or indeed for 1940.

The appraisal could have been used to discredit testimony in this proceeding by the man who made it, if a contradiction or inconsistency were thereby shown, had he been called, but not otherwise.

Also I have weighed the contentions that parcel B is jointly owned and should therefore be valued at less for that reason, than if it were held in sole ownership. In theory that is true, but practically it does not affect the present question of value, since marketability has not been shown to be thereby impaired.

As to the residential zoning of parcels B and C, it is true that an impediment to marketability might have been created if it had been shown that a re-zoning application was made and refused in 1940. I cannot ascribe to the authorities of the Town of Babylon an unwillingness to accord to these owners an opportunity to use their property according to its manifest adaptability in the late months of 1940, in the absence of evidence to the contrary.

Settle award in proper form, upon notice.