No. 41,144

GEORGE W. HOY and ETHEL HOY, *Appellants*, v. KANSAS TURNPIKE AUTHORITY, *Appellee.*

(384 P. 2d 315)

Opinion filed January 24, 1959.

*Floyd A. Sloan,* of Topeka, argued the cause, and *W. Glenn Hamilton, Eldon Sloan,* and *James W. Sloan,* all of Topeka, were with him on the briefs for appellants.

*Robert M. Cowger,* of Topeka, argued the cause, and *Ernest J. Rice,* of Topeka, was with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: This eminent domain proceeding was commenced by the Kansas Turnpike Authority to acquire a portion of its right of way. The landowners, George and Ethel Hoy, appealed to the district court from the award of the appraisers. Following a trial by a jury, they were awarded $7,400 for the value of the land taken and damage to the land not taken, and judgment was entered in harmony with the verdict. The Hoys have appealed

from that judgment, the refusal of the district court to give requested instructions, and its order overruling their motion for a new trial.

The Hoys owned and occupied a 265-acre farm southwest of Topeka consisting of 112 to 120 acres suitable for cultivation, 130 acres of pasture and hay land, eight acres of rough timberland, and the remainder was utilized for the home, farmyard and improvements. In June, 1955, the Authority condemned a strip of land for right of way purposes 300 feet wide running diagonally across the farm in a northeasterly-southwesterly direction containing 14.62 acres. The right of way divided the farm into odd shaped fields and cut through the farmyard so that the south line of the right of way was only seven feet north of the barn and about 145 feet north of the house. There was a north-south county highway immediately west of the farm improvements, upon which an overpass over the turnpike was constructed necessitating a grade several hundred feet long, 20 feet high at the turnpike roadway, and twelve feet high immediately in front of the house, obstructing vision to the west and northwest. Some additional small tracts along the county highway were also condemned by the Authority to permit ingress and egress to and from the farm, bringing the total number of acres taken to 15.06.

Located upon the land taken were three trees, a second barn, hog house, cow shed, built-in stone wall self feeder, 1,010 feet of stone wall corrals averaging five feet in height and 28 inches wide at the bottom and 21 inches at the top, and a well which was the farm's main source of water. This well is especially valuable because it has an inexhaustible supply of water and is the only well that does not go dry in extended periods of drought. Attempts to locate other wells which would furnish an adequate supply of water have been unsuccessful.

To give the Hoys more room to get into and around the barn not taken, the right of way fence was moved 30 feet north of the south line of the right of way so that the well is "outside" the fence and presently accessible to the Hoys, and the distance between the fence and the nearest point to the barn was increased to 37 feet. The Authority has not given the Hoys an easement or conveyed its right to the well thus assuring them of a permanent water supply, and it has the right to move its fence to the south line of the right of way at any time, cutting off access to the well and around the barn not taken.

Prior to the taking, the entrance to the farm from the county highway was down by the barn. As a result of the condemnation, the entrance was changed so that all hauling to and from the farm now passes close to the house. Previously, the corrals were north of the entrance and the lay of the land was such that drainage from the corrals was away from the improvements. After the taking, there was no place for stock corrals similar to those existing prior to the condemnation, and drainage from the farmyard was also changed. At the present time, traffic noise from the turnpike can be heard plainly in the house.

At the time the right of way was condemned the Hoys knew that about twelve of thirteen acres of land taken was underlaid with rock twelve to eighteen feet thick, which extended across and 1,250 feet along the right of way. The rock outcropped near the corrals and was a few feet under the surface elsewhere. The Authority contracted with the Weaver Construction Company to cut through the rock and clear it from the right of way. Weaver subcontracted the work and the roadbed was cut too deep, necessitating that it be refilled to grade level with loose rock. After construction was commenced, the Hoys leased rock on both sides of the right of way to the Weaver Construction Company and were paid $1,000 an acre for the rock taken. The number of acres leased is not disclosed. Rock removed from the right of way, as well as that taken from the Hoys' land, was used in the construction of the turnpike. The Hoys received no compensation from the Weaver Construction Company for rock removed from the right of way.

At the trial three real estate dealers, as expert witnesses, and three farmers living in the vicinity testified for the Hoys. Each stated he was familiar with the improvements on the land at the time it was taken and knew it was underlaid with rock. They testified that the fair market value of the land when taken was from $8,450 to $11,975, and the difference in value of the remaining land before and after the taking was from $9,467 to $15,550. Mr. Hoy testified that the market value of the land taken was $9,500, and that the market value of the remainder of the farm before the taking was $36,500, and immediately after was $23,000. Also, that he used the farm for general farming operations and the raising of hogs and cattle, and knew it was underlaid with rock. He further testified that at the time of the taking wheat was growing upon the land taken.

Three real estate dealers, as expert witnesses, testified for the

Authority that the fair market value of the land taken was from $1,700 to $1,900, and the difference in value of the remainder before and after the taking was from $4,025 to $4,820. Upon cross-examination each testified that he did not include in his valuation of the land taken the trees, the stone corral fences, the buildings, the well, or the rock beneath the surface, but that at least a part of the improvements were considered in arriving at the damage to the land not taken.

The principal questions presented and argued are the elements which should be taken into consideration in determining the amount of the award. They arise on objections to evidence received, the exclusion of evidence offered, and the refusal of the court to give requested instructions. In discussing these questions appellants Hoy will hereafter be referred to as plaintiffs and the Authority as defendant.

Plaintiffs contend it was error for the court to sustain objections to questions asked one of their witnesses on redirect examination. The witness testified on direct examination to the value of the land taken and the value of the remainder before and after the taking. On cross-examination he stated he considered sales of comparable property in the vicinity but did not take into consideration two sales of land specifically inquired about. On redirect examination an objection was sustained to the question whether the two tracts of land inquired about upon cross-examination were, in his opinion, similar to the 15.06 acres acquired by the defendant. Plaintiffs moved to strike that part of the cross-examination relating to the two sales of land, which was refused. At the hearing of the motion for a new trial, the affidavit of the witness was presented in which he stated he would have answered the question "no." The questions on cross-examination assumed that the two tracts were sold at a given price and were proper to test the credibility of the witness. The question on redirect examination was an attempt to rehabilitate the witness and to establish why he did not consider the two sales of land inquired about. We think the question objected to was proper upon redirect examination (98 C. J. S., Witnesses, § 419, pp. 224, 225, and § 421, pp. 228, 229) and the witness should have been permitted to answer. If the credibility of a witness has been attacked on cross-examination, questions may be asked on redirect examination which will explain or give reasons for the answers given on cross-examination. It is proper to inquire of a witness

testifying to the value of land in condemnation proceedings, concerning sales of land in the vicinity for the purpose of testing his credibility, but he should be given the opportunity, on redirect examination, to explain the circumstances surrounding the sales, such as whether the land sold was similar to the land condemned. (*C. K. & N. Rly. Co. v. Stewart,* 47 Kan. 704, 28 Pac. 1017.)

As previously indicated, witnesses for the defendant testified they did not include in their valuation of the land taken the trees, the stone corral fences, the buildings, the well, or the rock deposits. G. N. Glenn, a witness for the defendant, testified, upon cross-examination, to that effect. Upon redirect examination the court, over plaintiffs' objection, permitted him to testify that although he did not include those elements in his valuation of the land taken, he did consider them in determining the reduction of the market value of the land not taken. Plaintiffs' claim that the buildings, fences, well and rock deposits must be included in determining the value of the land taken and that under the circumstances it was not proper to consider them as elements of damage to the land not taken. Under the circumstances presented by this record, it was error to permit the witness to testify concerning the value of the land taken when he did not take the trees, stone corral fences, buildings, and the well into consideration. (Consideration of the rock deposits and the rule with respect to the admissibility of the evidence of its value is hereafter stated.)

Improvements, such as here involved, located upon land which is condemned, are not to be valued separately but are a part of the real estate and must be considered in determining the value of the land taken. (*Saathoff v. State Highway Comm.,* 146 Kan. 465, 72 P. 2d 74; *Glover v. State Highway Comm.,* 147 Kan. 279, 77 P. 2d 189; *Reiter v. State Highway Commission,* 177 Kan. 683, 281 P. 2d 1080; *Case v. State Highway Comm.,* 156 Kan. 163, 131 P. 2d 696.) Where, as here, agricultural land devoted to general farming operations and the raising of livestock is acquired for public use, the value of buildings, other improvements and fixtures on the land taken may be given dual consideration; first, they are a part of the real estate and are required to be valued as a part of the land taken; and second, their taking may also be considered by the jury in determining the damage, if any, to the land remaining which is deprived of their use for the purpose to which the farm as a whole is adapted for its highest and best available use. In *Saathoff v. State Highway Comm.,* supra, it was said:

"The other claim of error is this: Appellants had some currant bushes and a few fruit trees on the condemned land. They were not permitted to put a value on them separate from the value of the land. While it was proper to permit testimony as to how the land was improved, the improvements were a part of the real estate and were not to be valued separately. (20 C. J. 797; 10 R. C. L. 141.)" (l. c. 466.)

In *Case v. State Highway Comm.,* supra, it was said:

"It is next contended that error was committed in permitting evidence to be introduced touching the value of the shade trees north of the house, apart from the value of the land on which the trees were growing, which land was taken for highway purposes. Appellant invokes the rule stated in *Saathoff v. State Highway Comm.,* 146 Kan. 465, 72 P. 2d 74, that in condemnation proceedings growing bushes and fruit trees being a part of the land should not be valued separately from the land itself. That rule is sound and we have no wish to weaken it. In the instant case the land taken with the shade trees thereon was valued regularly. But it was shown that it was a very substantial damage to the plaintiff's farmhouse by depriving it of its shade trees. We think it would be difficult to find a more apt illustration to justify the familiar rule of law in condemnation proceedings than the one presented here—that of allowing compensation for the land taken and damages to the land not taken—that is, to the farmhouse and its immediate grounds which were so injuriously affected by being deprived of its shade trees. There is no shadow of error under this assignment." (l. c. 165.)

Under circumstances where a witness considers elements such as shade trees, improvements and a well located upon land taken in eminent domain *in determining the value of land taken,* it is proper for him to testify that he also took those elements into consideration in determining damages, if any, to the land remaining. But where, as here, the witness *did not* include those elements in his valuation of the land taken, it was improper to permit him to testify upon redirect examination that he gave consideration to them in determining the reduction to the fair market value of the land not taken. The method of fixing the value of the land taken being improper, the admission of the testimony objected to was prejudicial since it permitted the jury to consider those elements for one purpose but not for the other. A substantial part of the facilities to which the use of the farm as a whole was devoted was taken, which would justify the jury in giving dual consideration to their taking, to be considered along with other competent evidence, in ascertaining the total amount to be awarded the plaintiffs. The testimony objected to should not have been received in evidence.

Plaintiffs contend the court erroneously permitted the defendant, in mitigation of the value of the land taken, to show their access to the well. During cross-examination and over plaintiffs' objection,

Mr. Hoy was required to state whether the defendant had offered to return a triangle shaped tract of land on which the well was located. He answered that it had not, and he was further required to state that the defendant had moved the right of way fence back, thus permitting access to the well. Plaintiffs moved to strike that testimony for the reason the question to be determined was the value of the land taken, and until the defendant reconveyed the well it remained its property and plaintiffs temporary access thereto was immaterial since the fence could be moved to the right of way line at any time in the future. In overruling the motion the court said, "I think they (the Authority) have a right to show that he had access to it . . . the well is in the right-of-way and belongs to the Turnpike, he has full access to it and use of it."

The general rule of declarations and future intentions of a condemner as to what will be done with respect to property condemned is stated in an annotation in 7 A. L. R. 2d, 366, as follows:

"Once it is ascertained in a particular situation that what is really involved is merely promissory, the courts are well agreed that an unaccepted promise, promissory statement or stipulation, or declaration of future intentions by a condemner as to what will be done or not done with respect to the property condemned, to that left untaken and to the rights of the landowner in relation thereto, cannot affect either the character or extent of the condemner's rights acquired or the amount of the damages it must pay as just compensation. A condemner cannot avail of what may aptly be termed a 'conditional' condemnation, but must take whatever rights are sought to be appropriated absolutely, paying in full therefor, regardless of future intentions; the rights acquired, and not the intended use of those rights, is the measure of the landowner's compensation."

The defendant's conduct in moving the fence back was, in effect, an implied declaration of intention that plaintiffs would continue to have access to the well and enjoy the benefits of an inexhaustible supply of water for the operation of their farm. That conduct brought the defendant within the rule above stated, and the testimony objected to should have been withdrawn from the consideration of the jury. This conclusion finds support in *Glover v. State Highway Comm.*, supra, where it was stated in the opinion that testimony offered in mitigation of damages to the effect that it was the policy of the highway commission not to cut trees on lands taken for highway purposes unless it was necessary to complete the work, and that it had given orders that the trees there involved should be left standing, was properly refused upon the ground that the commission had the right to cut the trees at any time in the

future notwithstanding its declared intention to the contrary. In view of the foregoing, the court erred in failing to strike the testimony.

Plaintiffs next contend the court erred in refusing to give two instructions requested by them. The pertinent portion of requested instruction No. 1 reads:

"As to the land actually taken, the measure of damages which you are to apply is the value thereof at the time of taking; that is, on June 22, 1955. In determining such value, you must consider all of the evidence before you, whether produced by plaintiff or defendant, taking into consideration what the testimony may show as to the size and quantity of each tract taken; its location and quality; and any improvements located upon the land so taken, including trees; any deposits of rock, stone or other minerals; and any legitimate use to which it is adapted and for which it might be used now or in the immediate future, including whatever use may be most advantageous, beneficial and valuable. You must not, however, consider any speculative claim as to what said tract or tracts might be worth at some remote time in the future, or for some possible use which is merely conjectured."

The second requested instruction pertained to damage to the land not taken and contained, in part, the following:

"If you find from a preponderance of the evidence, that the value of plaintiff's remaining land was diminished by the loss of the tract or tracts actually taken by condemnation, you should also allow to plaintiff damages in the difference between the value of his remaining land as it was immediately before said condemnation and its value immediately thereafter. In so doing, you must consider all of the evidence in the case, and you must take into consideration what the evidence may show as to the quantity and quality of plaintiff's remaining land; the best and most advantageous use to which it may be put; and any inconvenience or loss in the operation of said remaining land caused to plaintiff by the taking of the tract or tracts condemned; reduction of acreage; the construction of the viaduct or overpass over the Turnpike right-of-way; any obstruction of view; any interference with egress and ingress; any interference with the natural drainage; noise, if any, resulting from the vehicles traveling on the Turnpike; whether plaintiff's remaining land was in fact diminished in value by the taking of said condemned tract or tracts; and the amount of plaintiff's loss, if any."

The court instructed the jury there were two items for it to consider and decide; first, that plaintiffs were entitled to recover the reasonable market value of the 15.06 acres for its best and most advantageous uses, and second, if plaintiffs suffered damage by reason of the condemnation of a portion of their farm, that in ascertaining such damage, the jury had a right to consider all of the capabilities of the land and its most advantageous use as it was situated at the time of the taking, and that the measure of damage

for the injury, if any, was the difference between the market value of the remainder of plaintiffs' land immediately before and immediately after the appropriation. Plaintiffs contend that nowhere in its instruction did the court inform the jury that the trees, the stone corral fences, the buildings, and the well were a part of the real estate and should be considered in determining the value of the land taken; also, that the court's instruction concerning damage to the land not taken was general in that it did not advise the jury as to the elements which should be taken into consideration, and in order that the jury might understand what elements were to be considered, it was necessary that requested instruction No. 2 be given. The defendant invokes the rule that the refusal to give an instruction or a portion of an instruction in the specific manner requested is not error when the same is substantially covered by other instructions (*Collingwood v. Kansas Turnpike Authority,* 181 Kan. 43, 49, 310 P. 2d 211, and authorities cited therein), and argued that the instructions given substantially covered the matters set forth in the requested instructions.

As preliminary to discussing plaintiffs' contention, we note the oft repeated rule prevailing in this jurisdiction that in condemnation proceedings the owner is to be given by way of compensation the fair market value for the land taken plus the diminution in value of that remaining, based upon a consideration of all the capabilities of the property for its best and most advantageous uses as it was actually situated at the time of taking. The owner is entitled to show the fair market value of his land for every purpose to which it is adapted. The fact that it has been used for one purpose only does not prevent him from showing its availability for other appropriate uses and its value for such uses. A few of our many decisions in support of this rule are: *Railway Co. v. Weidenmann,* 77 Kan. 300, 303, 94 Pac. 146; *Federal Land Bank v. State Highway Comm.,* 150 Kan. 187, 92 P. 2d 72; *Mai v. City of Garden City,* 177 Kan. 179, 182, 277 P. 2d 636; *Reiter v. State Highway Commission,* 177 Kan. 683, 686, 281 P. 2d 1080; *Tinberg v. Kansas Turnpike Authority,* 181 Kan. 139, 143, 144, 310 P. 2d 217, and *Cline v. Kansas Gas & Electric Company,* 182 Kan. 155, 318 P. 2d 1000. It is the purpose of the law to secure to the landowner full compensation (*Railway Co. v. Roe,* 77 Kan. 224, 94 Pac. 259; *Irrigation Co. v. McLain,* 69 Kan. 334, 76 Pac. 853), and in the instant case, it was essential that improvements located on the land be considered in

arriving at the value of the land taken. (*Case v. State Highway Comm.*, 156 Kan. 163, 131 P. 2d 696.)

As previously noted, witnesses for plaintiffs testified they were familiar with the farm, the improvements thereon, and knew it was underlaid with rock, and that they considered those elements in valuing the land taken. On the other hand, witnesses for the defendant testified they gave no consideration to the trees, the corral fences, the buildings, the well, or the rock deposits (the rock deposits are hereafter discussed) in their valuation of the land taken, but did consider some of those elements (the well not being one of them) in determining damages to the land not taken. Thus, the court permitted the defendant to present its case upon an erroneous theory of damages and one entirely different from that presented by plaintiffs, and even admitted evidence over the objection of plaintiffs, in support of the erroneous theory of damages. In this state of the record, the court had the duty to specifically instruct the jury as to what elements it might take into consideration in determining the value of the land taken and damages to the land not taken. Without such definite instructions, the jury had no guide to follow. Moreover, the wide variance of valuation demonstrates the necessity that instructions should ignore no elements to be taken into consideration by the jury. It is not uncommon in condemnation proceedings that witnesses vary with respect to valuations and damages. But, where the parties present their evidence upon the same theory of damages the variance is immaterial since, under proper instructions as to what elements are to be considered, the question is then properly one of fact for the jury to decide. Here, the manner in which the testimony was presented and the objections and rulings of the court in the presence of the jury could have no effect but to thoroughly confuse it as to what elements should be considered in determining the damages. Substantially, the instructions requested by plaintiffs should have been given, subject, however, to modification as hereafter noted.

Under the record presented, were plaintiffs entitled to have the jury instructed that it could consider "any deposits of rock, stone or other minerals" in ascertaining fair market value of the land taken? Pursuant to general rules heretofore stated, plaintiffs are entitled to compensation according to the most advantageous and profitable use they could make of their land, the measure being the price which could be agreed upon at a voluntary sale between

an owner willing to sell and a purchaser willing to buy; in other words, the fair market value of the land. (*Railway Co. v. Roe,* 77 Kan. 224, 94 Pac. 259; *Bales v. Railroad Co.,* 92 Kan. 771, 141 Pac. 1009; 18 Am. Jur., Eminent Domain, § 242, pp. 875, 876.) It is settled that where land taken contains valuable mineral deposits the measure of compensation is the market value of the land with the minerals in it, and the value of the minerals cannot be shown separately. (*Reiter v. State Highway Comm.,* supra.)

While the owner should be given by way of compensation for his land its fair market value for any use for which it has a commercial value in the immediate present or which may reasonably be anticipated in the near future, the uses which may be considered *must be so reasonably probable as to have an effect on the present market value of the land;* purely imaginative, remote, or speculative value cannot be considered. (*Reiter v. State Highway Comm.,* supra; *P., C. C. & St. L. Ry. Co. v. Gage,* 286 Ill. 213, 121 N. E. 582; *Illinois Power & Light Corp. v. Parks,* 322 Ill. 313, 153 N. E. 483; *Olson v. United States,* 292 U. S. 246, 78 L. Ed. 1236, 54 S. Ct. 704; *People v. McReynolds,* 31 Cal. App. 2d 219, 87 P. 2d 734; *State et al. v. Hoblitt et al.,* 87 Mont. 403, 288 Pac. 181; 18 Am. Jur., Eminent Domain, § 244, p. 879; 29 C. J. S., Eminent Domain, § 160, pp. 1026, 1027.) It has been held that the question in such a case is not whether the property is peculiarly adapted for the use claimed —here, rock deposits claimed suitable for quarrying—but whether purchasers can be found who would pay more for it because of the adaptability to the use to which the same might be applied (*N. Y. C. R. R. Co. v. Maloney,* 234 N. Y. 208, 218, 137 N. E. 305). Thus, before an owner of condemned land can show adaptability to a use for purpose of ascertaining fair market value for the land as a whole, he must show that a market for such use exists or is reasonably likely to exist in the near future. (*Reiter v. State Highway Comm.,* supra, p. 688; *St. Joe Paper Co. v. United States,* 155 F. 2d 93; *Olson v. United States,* supra; *United States v. Miller,* 317 U. S. 369, 87 L. Ed. 336, 63 S. Ct. 276, 147 A. L. R. 55; *Cameron Development Co. v. United States,* 145 F. 2d 209, 210), but that market may not be established by, and the owner is not entitled to compensation for, any element resulting subsequently to and because of the condemnation. (*United States v. 243.22 Acres of Land, Etc.,* 48 F. Supp 177; *United States v. Improved Premises, Etc.,* 54 F. Supp. 496.)

In the Cameron Development case, *supra,* the United States condemned for use as a Naval Air Station 858 acres of land which had been used exclusively as pasture land. After taking possession of the property it excavated and removed a great amount of shell marl for the construction of runways. The owner attempted to prove that the deposits greatly enhanced the market value of the property, but all of this testimony was stricken upon motion of the government. It was conceded the amount awarded was just compensation for the property as pasture land and the question on appeal was whether the court erred in striking the testimony. The gist of the testimony was that shell marl had a commercial use as a stabilizer in the base of asphalt roads, which had an established price in the vicinity at the time of the taking and could be mined commercially for consumers as far as eighteen to twenty miles distant. Some counties in Florida used shell marl in road construction. It was also conceded the deposits were sufficiently extensive to supply the base for a road of some distance. In the opinion it was said:

". . . In determining this value, the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future, is to be considered; but elements affecting value that depend upon events, which while possible are not fairly shown to be reasonably probable, should be excluded. The judicial ascertainment of fair market value may not rest upon speculation and conjecture, nor is any owner entitled to compensation for any increase in value that may result to the property because of its condemnation.

"The proof offered by appellant, measured by these settled standards, did not establish that the property was available for use as a source of supply of shell marl. No evidence was offered to prove that any market existed, or was reasonably likely to exist in the near future, at which this shell could be profitably sold. No showing was made that any purchaser was willing to pay any more for the land, because of its shell deposits, than its market value as pasture land.

"The mere physical adaptability of the property to use as a source of supply of shell marl, in the absence of a market for its commercial production, did not effect an increase in its market value. In these circumstances, it was the duty of the court to exclude from the consideration of the jury all of the stricken testimony." (p. 210.)

See, also *United States v. Land in Dry Bed of Rosamond Lake, Cal.,* 143 F. Supp. 314, involving deposits of rotary clay used in oil drilling; *United States v. Rayno,* 136 F. 2d 376, *certiorari* denied 320 U. S. 776, 88 L. Ed. 466, 64 S. Ct. 90, involving a hardpan material used as a gravel pit for construction of a flood control project;

*Cade v. United States,* 213 F. 2d 138, involving agricultural land containing deposits of granite rock for which a market was shown; *National Brick Co. v. United States,* 131 F. 2d 30; *St. Joe Paper Co. v. United States,* supra.

Turning now to the record, there was ample evidence that plaintiff's farm was agricultural land devoted solely to general farming operations and the raising of livestock. Although they knew of the presence of the rock, there is nothing to show that at the time of the taking plaintiffs contemplated quarry use in the near future. In fact, wheat was growing upon the land at the time of the taking. Moreover, no market was shown to exist or reasonably likely to exist for rock quarried from plaintiffs' land, other than that sold the Weaver Construction Company for use in constructing the public improvement for which the land was taken. No evidence was offered to prove that purchasers were willing to pay more for the property because of the rock deposit than its market value as agricultural land. Whether the rock would ever be quarried and marketed was mere speculation. Hence, the market created by the construction of the turnpike, although established by contract with a private contractor, was subsequent to and resulted from the condemnation, which, as we have seen, may not be used to establish the market necessary to show adaptability of the land for quarry purposes. (*United States v. 243.22 Acres of Land, Etc.,* supra; *United States v. Improved Premises, Etc.,* supra.)

It is common knowledge that much of the eastern third of the state is underlaid with rock. In many instances, outcroppings of rock and that in land devoted to agricultural pursuits reduce its value. Thus, the mere physical presence of the rock in land taken is not enough to show its adaptability for quarrying purposes nor justify an assessment of damages in excess of its market value as agricultural land without proof of such additional factors as quantity and quality of the rock deposit sufficient to induce quarrying operations, and a ready market for the rock produced. In view of these facts, that part of requested instruction No. 1 advising the jury that it may consider "any deposits of rock, stone or other minerals" must necessarily be modified in accordance with the views herein expressed. Had there been testimony showing a market for the rock in question aside from the market created by the construction of the turnpike, the jury, upon proper instructions, might have concluded that a willing buyer would give more and a willing seller would insist on receiving more for the property as a whole because

of the presence of the rock deposit. (*United States v. Rayno,* supra; *United States v. Land in Dry Bed of Rosamond Lake, Cal.,* supra; *Cade v. United States,* supra.)

Inferentially, plaintiffs contend that because the defendant used the rock in constructing the turnpike they should receive additional compensation. The point is not well taken. In the first place, the condemnation was to secure the right of way and not to obtain the rock; that was a by-product of the condemnation. In the second place, in determining the amount of damage to property appropriated for public use, the question is not what the taker has gained, but what the owner has lost (*Boston Chamber of Commerce v. Boston,* 217 U. S. 189, 54 L. Ed. 725, 30 S. Ct. 459; *United States v. Chandler-Dunbar Co.,* 229 U. S. 53, 57 L. Ed. 1063, 33 S. Ct. 667).

Other questions raised by the parties need not be considered and discussed in view of what has been heretofore stated. Conclusions heretofore announced require the entry of an order setting aside the judgment and granting plaintiffs a new trial.

The judgment is reversed.

PRICE, J., concurring in the result.