**GREYSTONE HEIGHTS REDEVELOP-MENT CORP., Plaintiff-Appellant,**

v.

**NICHOLAS INVESTMENT CO., INC., et al., Defendants-Respondents.**

KCD 26260.

Missouri Court of Appeals,
Kansas City District.

Oct. 1, 1973.

Harry P. Thomson, Jr., John R. Caslavka, and B. Douglas Varner, Shughart, Thomson & Kilroy, Kansas City, for plaintiff-appellant; Gage, Tucker, Hodges, Kreamer, Kelly & Varner, Kansas City, of counsel.

James E. Grier, R. Dennis Wright, Kansas City, for defendants-respondents; Hillix, Brewer & Myers, Kansas City, of counsel.

Before SHANGLER, P. J., and SWOFFORD and WASSERSTROM, JJ.

WASSERSTROM, Judge.

In this eminent domain case, the plaintiff condemnor appeals from an award to the defendant condemnee by jury verdict in the amount of $125,315.40. Plaintiff argues seven points on this appeal, which also include several subpoints. However, its Points IB and IIIA relate to a fundamental and decisive question which requires reversal. This matter concerns the trial court admitting evidence pertaining to the rock underlying defendant's land, on the theory that the existence of this rock substrata was a factor affecting the market value of the land being taken. Inasmuch as this one question is decisive of this appeal, consideration of the factual background can be narrowed to that pertinent to this issue.

Plaintiff condemnor is one of a family of corporations engaged in redevelopment of blighted areas under the Urban Redevelopment Corporation Law of Missouri. Its parent company developed the Downtown Industrial Park at 31st and Mercier in Kansas City, Missouri, which involved development of underground storage space by mining out limestone, as well as developing the surface for the more usual type of industrial use.

Subsequently, the precise date not being shown by the record, plaintiff became interested in developing Greystone Heights, which is in the same general area as Downtown Industrial Park, in a similar manner. Greystone Heights encompasses a bluff overlooking the Kaw River Valley, and is situated just east of the Kansas/Missouri State Line, westerly of Kansas City Terminal Railroad and the Frisco Railroad rights-of-way, and just to the north of the route of I–35 Interstate Highway. After what was obviously a considerable period of planning, negotiations, and preparation of maps, drawings and exhibits, plaintiff filed a formal Development Plan with the City of Kansas City, Missouri, on June 26, 1967, setting forth its proposed Greystone Heights project.

The Plan so filed proposed to develop more than 60 acres both above ground and underground. The development work was proposed to be done in four stages. Stage 2 included the 6.85 acres owned by defendant. Stage 1, lying immediately to the east, was to be developed first in timing. A portion of the work represented by Site A of Stage 1 had already been completed before the Development Plan was filed with the City, and was already being leased to U. S. Cold Storage Company for underground storage purposes. The Development Plan called for the extension of that underground storage space through horizontal mining from Stage 1 into Stage 2.

This Development Plan was approved by the City under Ordinance No. 34544, on November 17, 1967. That ordinance conferred various benefits and privileges upon plaintiff, including the right to condemn any properties within the proposed project which could not be acquired by negotiations. Prior to the enactment of this ordinance, plaintiff already had acquired by negotiated purchase 80% of the land required for the project. However, it was unable to negotiate an agreement with defendant, and it therefore, filed the present condemnation proceedings on March 21, 1968. The parties have stipulated that the date of taking and consequently the valuation date was June 27, 1968.

A very large part of defendant's evidence before the trial court was devoted to showing that its property is underlaid with the Bethany Falls limestone stratum, that this rock is present in a substantial amount and that this type of rock is commercially saleable on a ready market. Defendant also attempted to show that its own tract of 6.85 acres was capable of being quarried by itself, separate and apart from any other adjacent rock-bearing property. It attempted to make this proof through three witnesses, each of whom ultimately failed to support defendant's effort in this regard.

One of these three witnesses, Rule, admitted on cross-examination that it was

"[n]ot very practical to mine this tract by itself"; that "it has no real value to mine it by itself"; that "none of the Bethany Falls Limestone outcrops on the subject property and that therefore the only way to reach it would be through shaft mining which would not be feasible for a tract of this size"; and that any attempt to mine defendant's small acreage by a vertical shaft "would be possible but not practicable". Similarly, Prince, another witness for defendant, admitted that if the quarrying were limited to 6.9 acres, that certainly would be "very, very small to be commercially feasible to mine"; and that the start-up cost item alone for a 6.9 acre tract "would make it not practical to start-up there". Harry J. Nicholas, a stockholder and officer in defendant corporation, did testify on direct examination that this 6.85 acre tract was suitable for industrial use "and also for quarrying the rock". However, on cross-examination he admitted that he did not know the commercial feasibility of getting rock out of a tract containing only 6 to 7 acres. This concession by Nicholas on cross-examination deprives his opinion of any probative value. Shelby Cy. R–IV Sch. Dist. v. Herman, 392 S.W. 2d 609 (Mo.1965); 31 Am.Jur.2d, Expert and Opinion Evidence, § 142, pp. 696–697.

█ Plaintiff argues in this Court, in line with the strong position it took at every available opportunity in the trial court, that all evidence as to limestone underlying defendant's tract should have been excluded, inasmuch as the evidence did not show that defendant or any purchaser from it of the 6.85 acre tract could have gotten to that rock in any economically feasible manner. It was, of course, the defendant's obligation to overcome that objection and to show why the evidence concerning the rock was relevant and legally open to consideration for the purpose of evaluation. Union Elec. Co. v. Jones, 356 S.W.2d 857, l.c. 862 (Mo.1962). Recognizing that burden upon it, defendant does attempt to justify the admissibility of evidence concerning the rock under its land, on two bases. Neither of the proffered justifications is supportable.

I

The first attempted justification by defendant for the evidence in question is the theory that a potential purchaser, in placing a value on this land for purposes of purchase, would normally take into consideration the fact that there was an existing underground storage operation already in existence on adjacent land owned by the plaintiff, and that plaintiff's existing storage operation could only be expanded by extending its space by excavating into defendant's land and removing limestone therefrom in the same manner as had originally been done in Stage 1. As defendant puts it in its brief: "[i]t becomes patently obvious that the subject tract has an enhanced value because of the Bethany Falls limestone deposits for two reasons (1) it is contiguous to an existing mine operation and (2) the tract was required in order for the owner of the contiguous property to expand its operations. * * * any prospective purchaser of the subject tract, after considering the proximity of the defendant's property to the operating cold storage facility and the availability of the limestone for mining purposes would ascribe more value to the defendant's property * * *" This argument by defendant fails because of two defects.

█ A. The first of these defects in defendant's argument is that it is not entitled to the benefit of an enhancement in value of its land which was caused by an improvement made as part of the project for which defendant's land is being condemned. 27 Am.Jur.2d, Eminent Domain, § 284, p. 82; 147 A.L.R. 66, l.c. 88; Missouri State Park Bd. v. McDaniel, 473 S. W.2d 774, l.c. 779 (Mo.App.1971); St. Louis Elec. Term. Ry. Co. v. MacAdaras, 257 Mo. 448, 166 S.W. 307, l.c. 309 (1914). This legal rule applies even though plaintiff had made the U. S. Cold Storage underground facility prior to the time it started any condemnation proceedings.

That essentially was the situation in the MacAdaras case, where the Supreme Court nevertheless held that the condemnee was not entitled to the benefit of any enhancement in value which was brought about by the condemnor's commencement of improvements on neighboring land before it had filed condemnation proceedings of any kind.

There is, however, one possible escape by defendant from the operation of this rule. The rule applies only where the taking of condemnee's land is an expansion of the prior improvement, and the expansion was originally contemplated as part of one entire project. Missouri State Park Bd. v. McDaniel, supra. The parties here did not direct themselves to this issue in the trial of the case, nor in argument here, and the evidence on this point is unsatisfactory. Much of the evidence does indicate that all of the Greystone Heights development, including all four stages, was always contemplated as a single project from the very beginning. Furthermore, both parties argue the case as a whole on an unstated assumption that this is the fact. On the other hand, certain evidence which came in for other purposes shows that plaintiff acquired in 1960 the property designated as Tract 1 in the Development Plan, and that at the time of that acquisition a very extensive area had already been mined out, leaving empty underground space subsequently leased by plaintiff to U. S. Cold Storage Co. The Development Plan itself was not presented to the City until 1967, and the record is silent as to whether that original acquisition in 1960 was in contemplation of the Development Plan which finally surfaced publicly seven years later. Nor is there any showing as to just when the underground storage facility leased to U. S. Cold Storage Co. was finally completed, nor whether that completion was in contemplation of the entire project set forth in the Development Plan. If the defendant can show that what is now Stage 1 was acquired and developed by plaintiff as a project wholly independent of what later

became a new and different Redevelopment Plan, then the situation here would be parallel to that in Mo. State Park Bd. v. McDaniel. Unless it can do so, this case will be subject to the general rule of the MacAdaras case. Since this case must be retried, the parties will be free to develop more fully the evidence in this regard.

■ B. *The second defect in defendant's* argument, and an even more formidable obstacle for it to surmount, is the legal principle that a condemnee is not entitled to the benefit of a special value which can arise only by reason of the assemblage of its property with other property either already owned by the condemnor or which the condemnor is acquiring as part of the same condemnation project. The leading cases on this subject are two related opinions of the U. S. Supreme Court, both authored by Mr. Justice Holmes. The first of those opinions, McGovern v. N. Y., 229 U.S. 363, l.c. 372, 33 S.Ct. 876, l.c. 877, 57 L.Ed. 1228 (1913), holds:

"The enhanced value of the land as part of the Ashokan reservoir depends on the whole land necessary being devoted to that use. There are said to have been hundreds of titles to different parcels of that land. If the parcels were not brought together by a taking under eminent domain, the chance of their being united by agreement or purchase in such a way as to be available well might be regarded as too remote and speculative to have any legitimate effect upon the valuation. See Chicago, B. & Q. R. Co. v. Chicago, 166 U.S. 226, 249, 17 S.Ct. 581 (589), 41 L.Ed. 979, 989. The plaintiff in error was entitled to be paid only for what was taken from him as the titles stood, and could not add to the value by the hypothetical possibility of a change unless that possibility was considerable enough to be a practical consideration and actually to influence prices. Boston Chamber of Commerce v. Boston, 217 U.S. 189, 195, 30 S.Ct. 459 (460), 54 L.Ed. 725, 727. In estimating that probability, the power of effecting the

change by eminent domain must be left out."

The principle was amplified in N. Y. v. Sage, 239 U.S. 57, 36 S.Ct. 25, 60 L.Ed. 143 (1915), as follows:

"The decisions appear to us to have made the principles plain. No doubt when this class of questions first arose it was said in a general way that adaptability to the purposes for which the land could be used most profitably was to be considered. But it is to be considered only so far as the public would have considered it if the land had been offered for sale in the absence of the city's exercise of the power of eminent domain . . . The city is not to be made to pay for any part of what it has added to the land by thus uniting it with other lots, if that union would not have been practicable or have been attempted except by the intervention of eminent domain."

The doctrine stated in those opinions continues to represent the controlling legal principle. Nichols on Eminent Domain, Vol. 4, § 12.21, p. 12–89, for example, states the rule to be:

"If adaptability depends upon the particular parcel being assembled with other parcels, so as to make a tract sufficient in extent to render it useful for the projected purpose, such artificially created adaptability is considered too remote and speculative to be considered in fixing valuation.

\*　\*　\*　\*　\*　\*

"The rule rejecting value to the taker has a corollary in cases holding that the condemnor may not be required to pay 'hold up' value, that is, the price which the owner could demand if the condemnor were not clothed with the power of eminent domain and the owner threatened to block the project unless his terms were met."

■ This rule is merely a special application of the universal principle that the value of land in condemnation is that which it has to the condemnee, not to the condemnor. As stated in the much quoted aphorism of Mr. Justice Holmes in Boston Chamber of Commerce v. Boston, 217 U.S. 189, l.c. 195, 30 S.Ct. 459, l.c. 460, 54 L.Ed. 725:

"The question is, What has the owner lost? not, What has the taker gained?"

This basic rule is followed uniformly throughout the country, including Missouri. State v. Howald, 315 S.W.2d 786, 790 (Mo.1958); Union Elec. Co. v. Pfarr, 375 S.W.2d 1, 8 (Mo.1964); In re Armory Site in Kansas City, 282 S.W.2d 464 (Mo. 1955); St. Louis, K. & N. W. R. Co. v. Knapp, Stout & Co., 160 Mo. 396, 61 S.W. 300, 302 (1901); Jahr, "Eminent Domain", § 87, p. 123; 27 Am.Jur.2d, Eminent Domain, § 282, p. 76; 29A C.J.S. Eminent Domain § 160(e), p. 691; Nichols on Eminent Domain, Vol. 4, § 12.21, p. 12–87 and § 13.22[2], p. 13–126.

■ Brief mention should be made of an exception made in certain unusual cases to the above general rule that a special usefulness to the condemnor cannot be considered for the purpose of evaluating the land being condemned. This exception has been stated in various ways, but a particularly felicitous statement appears in United States v. Boston, C. C. & N. Y. Canal Co., 271 F. 877, 893 (CA1, 1921): "We are of the opinion that, in ascertaining the market value of property taken in a condemnation proceeding the utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use the property for that purpose. If, however, the property has a special utility or availability, not only to the taker, but to the other parties who could use the property for the particular purpose intended by the taker, then this utility or availability may be shown."

■ Defendant here apparently seeks to bring itself within this exception by its argument that a prospective buyer of

its tract would take into consideration the proximity of plaintiff's existing underground storage facility. However, to come within the exception requires more than the possibility that a buyer would be willing to pay some premium in order to buy defendant's position in an expectation of forcing plaintiff to pay a "hold-up" value as the price for not blocking an expansion by plaintiff. Even if such a possibility or even probability be conceded, that would merely substitute a new player in the very same contest now under consideration and would not change the applicability of the general rule. The only way to add a new factor, which would have legal significance so as to change the situation and make the exception applicable, would be for defendant to show a reasonable probability that some third party would have made a specially high bid for defendant's land because of the rock content, had plaintiff's taking by condemnation not occurred, for a purpose competitive to that of plaintiff. Such a situation conceivably might be shown, for example by proof that a third party was proposing an assemblage of properties in Greystone Heights without resort to any power of eminent domain. Only by some such showing would there be created a competitive market demand for defendant's land or the rock content which is contemplated by the exception under discussion. Absent at least two bidders, there cannot be a "market" in which there can arise a "market value", as contrasted to a private value to plaintiff for a use unique to it.

The record here contains not one shred of evidence to indicate that any such third party bidder ever existed or was likely to appear in the reasonably near future. However, defendant's counsel have exhibited considerable ingenuity and resourcefulness in preparation and presentation of this case, and they will not be foreclosed on retrial from supplying additional evidence, if they can, to prove this kind of a possibility.

II

The second justification offered by defendant for taking the stone into consideration in reaching a valuation for its land, is the theory that plaintiff has condemned this rock specifically and that, therefore, defendant has a right to introduce evidence of the value of the rock so to be taken. It relies upon the rule to that general effect stated in Nichols on Eminent Domain, Vol. 4, § 13.22 and in 29A C.J.S. Eminent Domain § 174, p. 735.

■ The fallacy in defendant's argument is that this principle is applicable only where the condemnor wants and takes the minerals alone, separate from the fee. Where the entire land is taken, the standard for evaluation is the value of the land, together with whatever augmentation the condemnee can show to that value by reason of the mineral or rock deposit. The distinction between condemnation of the entire fee as against a partial taking of the minerals alone is sharply drawn in Petition of Mackie, 2 Mich.App. 698, 141 N.W.2d 312, 315 (1966), where the court held:

> "We think the correct rule regarding condemnation of land containing valuable mineral deposits may be summed up as follows:
>
> "If a fee or a right of way is condemned the before and after value of the land measures the damage and mineral deposits may be shown to affect its value per acre. 29A C.J.S. Eminent Domain § 174, p. 735 et seq., 156 A.L.R. 1416 et seq.
>
> "If the right to remove minerals is condemned their value in place must be established to fix the damage, ibid."

The same distinction is drawn in State ex rel. State Hwy. Comm. v. Foeller, 396 S. W.2d 714 (Mo.1965).

Moreover, looking at the total situation here, it cannot accurately be said that plaintiff condemned only the rock deposit or even that it was interested primarily in

the rock deposit. The Development Plan and the evidence as a whole makes it plain that plaintiff was primarily interested in the empty storage space that it would obtain after removal of the rock. Here even more than in Hoy v. Kan. Turnpike Authority, 184 Kan. 70, 334 P.2d 315, l.c. 325–326 (1959), the rock obtained by the condemnor was a mere "by-product of the condemnation." In the Hoy case, farmland was condemned for a turnpike and the condemnor used some of the rock underlying the property taken as construction material. The landowner contended, as does defendant here, that since the condemnor used the rock it should have to pay for it. The court held to the contrary:

"Inferentially, plaintiffs contend that because the defendant used the rock in constructing the turnpike they should receive additional compensation. The point is not well taken. In the first place, the condemnation was to secure the right of way and not to obtain the rock; that was a by-product of the condemnation. In the second place, in determining the amount of damage to property appropriated for public use, the question is not what the taker has gained, but what the owner has lost (Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725; United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063."

See also to the same effect In the Matter of Water Comm'rs. v. Lawrence, 3 Edw. Ch. 552, 557–558 (N.Y.1842).

### III

Since this case must be retried, one additional point should be considered to eliminate the question recurring on retrial. As part of its case, defendant introduced a resolution which had been adopted by the City Council of Kansas City, Missouri, urging the State Highway Commission to locate an additional interchange for I–35 so to provide access to and from a point which would be near defendant's property. Plaintiff objected to the introduction of that resolution, and it argues here that the admission of that evidence was error, on the grounds that the resolution had no binding effect and that this evidence sought to enhance the market value of defendant's property by reference to uncertain future events.

■ The rule in condemnation cases is that all evidence should be permitted which is of a nature which an ordinarily prudent man would take into account before forming a judgment as to the market value of property he contemplates purchasing. As stated in State ex rel. Hwy. Comm. v. Barron, 400 S.W.2d 33 (Mo.1966):

"[T]he tendency is to admit any evidence which sheds light on the question, leaving it to the discretion of the trial court to keep it within bounds. Artificial rules of evidence which exclude from the jury matters which men consider in their everyday affairs hinder, rather than help, the arrival at a just result."

See also Missouri State Park Bd. v. McDaniel, 473 S.W.2d 774 (Mo.App.1971).

■ Applying that rule here, the admission of this evidence cannot be said to be an abuse of the trial court's discretion. The resolution was not introduced on any theory that the City Council had power to establish the suggested interchange. This resolution did, however, constitute a potent recommendation and request by the elected representatives of a large governmental unit in this State addressed to the State Highway Commission. Any reasonable prudent prospective buyer contemplating the purchase of this land would have given some consideration to the fact that the request had been made, and he very probably would have concluded that the request by the City Council would have some signifi-

cant weight with the Commission. Admission of this evidence therefore was not error.

The judgment is reversed and the cause is remanded for new trial.

All concur.